Paul D. Scott, Esq. (SBN 145975)
pdscott@lopds.com
Lani Anne Remick, Esq. (SBN 189889)
laremick@lopds.com
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100, The Embarcadero
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relators

**FILED**

**May 21, 2013**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES *ex rel.* BRENT STANLEY and PATRICK McKILLOP and STATE OF CALIFORNIA *et al., ex rel.* BRENT STANLEY and PATRICK McKILLOP, | No. 2:11-CV-3260 GEB DAD |
| | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS** |
| Plaintiffs, | |
| v. | **FILED UNDER SEAL** **31 U.S.C. § 3729,** *et seq.* |
| IRON MOUNTAIN, INC. and IRON MOUNTAIN INFORMATION MANAGEMENT, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |
| _____ | |

## INTRODUCTION

1.     This is an action to recover damages and penalties on behalf of the United States, the State of California and other California political subdivisions arising from false claims, false statements, and other conduct by defendants Iron Mountain, Inc. and Iron Mountain Information Management, Inc. in violation of

1

the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, both pre-amendment and as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617 (2009) ("FERA"), the 2010 Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010) ("PPACA"), and the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010),  and in violation of the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq*.

2.     The action under the federal False Claims Act arises out of defendants' false or fraudulent statements and conduct, including providing false information to the General Services Administration of the United States (GSA) about defendants' commercial pricing practices.  As a result of defendants' false representations, GSA was induced to enter into and maintain contract terms and conditions, including pricing, to which it would not have agreed, and the United States was induced to make payments it would not have made, had defendants accurately and truthfully disclosed their commercial sales practices to the Government.

3.     As discussed in detail herein, defendants' false or fraudulent statements, false claims, and fraudulent conduct regarding commercial sales practices included, but were not limited to, the following.  First, defendants provided false, incomplete, and inaccurate information to the Government regarding their commercial pricing practices in connection with their application for a GSA Multiple Award Schedule (MAS) contract originally awarded in 2001 and in connection with the extension of that contract in 2006, resulting in the United States agreeing to prices that were higher than it would have agreed to had defendants provided true, complete and accurate information.  Second, in order to obtain modifications to the GSA MAS contract, defendants reiterated and confirmed false statements that they had made during the contract negotiations and breached their affirmative duty to inform the Government of higher

discounts/lower prices they were offering to commercial customers.  Third, during the performance of the GSA MAS contract, defendants submitted claims for payment while falsely omitting to report to GSA that they had offered higher discounts/lower prices to other customers than had been disclosed to GSA during the contract negotiations, and submitted claims for payment which failed to provide these higher discounts/lower prices to Government purchasers, as required by defendants' GSA MAS contract, thus overcharging the Government.  Finally, defendants failed to return known overpayments resulting from their wrongful conduct.  Defendants also submitted false statements and false claims in the same manner in connection with a second GSA MAS contract under which defendants offered certain of the same services, at the same prices, as the first contract.

4.     In addition to false claims submitted under their GSA MAS contracts, defendants also submitted false claims under other federal contracts which required defendants to provide the Government with prices equal to or lower than their lowest comparable prices to other customers (for example, by requiring pricing based in whole or in part on the prices in defendants' GSA MAS contract, which, unbeknownst to other federal contracting entities, were falsely inflated prices).

5.     Defendants also followed a corporate pattern and practice of overcharging customers by various methods including, but not limited to:  billing for services not provided, billing at rates that were higher than the rates agreed to by contract, and billing for charges that were not allowable under the contract, as further described herein.  Pursuant to this pattern and practice of overcharging, defendants knowingly submitted false claims to the Government under their GSA MAS contracts, other contracts with federal entities, and other contracts paid for in whole or part with federal funds.

6.     As a result of defendants' false and fraudulent statements and conduct, defendants knowingly submitted and caused to be submitted millions of dollars of false or fraudulent claims for payment to the United States for services and goods

they sold to the United States, and otherwise violated the federal False Claims Act as detailed below.

7.     The action under the California False Claims Act arises from similar false claims, false statements and fraudulent conduct by defendants with respect to pricing violations involving their California Multiple Award Schedule (CMAS) contract and other contracts with state and local entities within the State of California, including, but not limited to, those referenced herein.  Specifically, per the terms of the CMAS program, pricing under Iron Mountain's CMAS contract was based directly on, and was identical to, the falsely inflated pricing in Iron Mountain's GSA contract.  Other Iron Mountain contracts with California state and local entities had best price, most favorable pricing, or low price guarantees or similar terms, but defendants failed to offer their lowest prices at the time of contracting, failed to provide information regarding lower prices offered to other customers during the course of the contracts, and failed to offer those lower prices to the State of California or other California state and local entities.

8.     Defendants also knowingly submitted false claims, made false statements and engaged in fraudulent conduct by overcharging California state and local entities through other overcharging practices as described herein.

9.     As a result of their false and fraudulent statements and conduct, defendants submitted and caused to be submitted false or fraudulent claims for payment to the State of California, and other California state and/or local entities and otherwise violated the California False Claims Act, as detailed below.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3732, as well as under 28 U.S.C. § 1367.  In addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.

11.     This Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because defendants transact business and are found in this District.

12.     Venue is proper in the Eastern District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district or a defendant may be found here, and/or acts proscribed by 31 U.S.C. § 3729 occurred in this district. Defendant has a place of business in this district in Sacramento, California.

13.     This action is not based upon a public disclosure.  Each relator is an original source of the information upon which this action is based.  Each relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States and the State of California before filing this action.

14.     As required by 31 U.S.C. § 3730(b)(2) and Cal. Gov't Code § 12652(c)(3), the Attorney Generals of the United States and the State of California and the United States Attorney for the Eastern District of California, were provided with a copy of the original complaint and a written disclosure of material evidence and information related to the complaint.  Disclosures were also made to the United States and the State of California prior to and in conjunction with the filing of relators' First and Second Amended Complaints.

15.     As required under the federal False Claims Act, this Second Amended Complaint has been filed *in camera* and under seal and shall not be served on the defendants until the Court so orders.

## PARTIES

16.     Defendants are Iron Mountain, Inc., Iron Mountain Information Management, Inc., and any and all of their predecessors in interest, successors in interest or assigns, including but not limited to Iron Mountain Government

Services, Inc.  Defendants are in the business of selling information management services, including document storage, shredding/destruction of records, and offsite data protection.  During the relevant time period, defendants have been doing business throughout the United States and within the geographical limits of the United States District Court for the Eastern District of California.  According to a recent Iron Mountain, Inc. SEC filing, defendants' customer base includes "more than 95% of the Fortune 1000."

17.     Defendant Iron Mountain, Inc. is a Delaware corporation and a publicly-traded company with a principal place of business in Boston, Massachusetts.  Iron Mountain, Inc. is a holding company, with substantially all of its assets being the stock of its subsidiaries and substantially all of its operations conducted by its directly- and wholly-owned subsidiaries.  Iron Mountain Inc.'s ability to make payments on its various debt obligations is dependent upon the receipt of sufficient funds from its subsidiaries.

18.     Defendant Iron Mountain Information Management, Inc. (also d/b/a Iron Mountain Off-site Data Protection, Iron Mountain Records Management, Iron Mountain National Underground, Iron Mountain Digital Archives, and Iron Mountain Secure Shredding) is a Delaware corporation with a principal place of business in Boston, Massachusetts and is a wholly-owned subsidiary of defendant Iron Mountain, Inc.  Iron Mountain Information Management, Inc. is in the business of selling information management services.  In or around September 2010, Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. (another wholly-owned subsidiary of Iron Mountain, Inc.) merged, with Iron Mountain Information Management, Inc. being the surviving entity.  Iron Mountain Information Management, Inc. is sued both in its own capacity and as successor-in-interest to Iron Mountain Government Services, Inc.

19.     During the relevant time period, defendants Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. sold their services and goods to the United States pursuant to GSA MAS Contract GS-25F-0066M ("the GSA Contract") and other contracts with federal entities or which were paid for in whole or in part with federal funds.  Iron Mountain Information Management, Inc. also sold its services and goods to the State of California, the City of Los Angeles, the County of San Bernardino, and other California state and/or local entities through additional contracts, as detailed below.

20.     During the relevant time period, Iron Mountain, Inc., Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. each had the same officers and had overlapping directors.  Iron Mountain, Inc. acted through its subsidiaries, including Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc.  Iron Mountain, Inc. dominated and controlled its subsidiaries Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. and used Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. to perpetrate the fraud described herein.

21.     In addition, Iron Mountain, Inc., Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc. use the same storage facilities, warehouses, procedures, policies, personnel, trucks and other equipment to perform their contracts.  The various entities also follow the same procedures and policies, such as, for example, "safety and security" procedures issued by Iron Mountain, Inc.  Some contracts are entered into by "Iron Mountain," without delineating which entity is entering into the contract.  Such contracts, and those entered into by a specific entity, such as "Iron Mountain Information Management, Inc.," are approved by the "Iron Mountain Legal Department."

Invoices do not distinguish among the companies but merely bear the "Iron Mountain" logo.

22.     Iron Mountain, Inc. was the alter ego of, caused the submission of false claims and false records or statements by, and caused other conduct in violation of the federal and California False Claims Acts by, Iron Mountain Information Management, Inc. and Iron Mountain Government Services, Inc., as detailed herein.

23.     Defendants are referred to herein collectively as "Iron Mountain," except as otherwise noted.

24.     The plaintiff and real party in interest as to the federal False Claims Act claims is the United States.

25.     The plaintiffs and real parties in interest as to the California False Claims Act claims are the State of California, and other state or local political subdivisions within the State of California, including without limitation:  a) all Iron Mountain CMAS customers (including but not limited to the California Department of Conservation, the California Fair Political Practices Committee, the California Department of Insurance, the California Department of Justice, the California Resources Agency (CALFED Bay-Delta)); b) all customers whose contracts with Iron Mountain included a best price, low price guarantee, most favorable pricing, or similar clause, or whose contracts negotiation or pricing were based in any way on CMAS or GSA pricing, including but not limited to the City of Los Angeles and the County of Santa Clara; and c) all customers to whom Iron Mountain submitted claims including known overcharges and/or failed to refund known overcharges, including the California 1st District Court of Appeal (San Francisco), the California 2nd District Court of Appeal (Los Angeles), and the County of San Bernardino, and, upon information and belief based upon Iron Mountain's corporate pattern and practice of overcharging as described herein, including all California state and local entities that purchased services from Iron

Mountain during the period 2001 to the present, including but not limited to all California customers listed above plus the California 3d District Court of Appeal, County of Los Angeles, County of San Diego, County of Orange, the Superior Court of California for the County of Butte, the Superior Court of California for the County of Sierra, the Superior Court of California for the County of Ventura, the City of Concord, the City of Thousand Oaks, Metropolitan Water District of Southern California (Los Angeles), Metropolitan Transit Authority (Los Angeles), and the California Technology Agency (a.k.a. Department of Technical Services or Teale Data Center).

26.     Relator Brent Stanley is a resident of Massachusetts and a United States citizen. Relator Stanley is bringing this civil action for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.,* for himself and on behalf of the United States Government, pursuant to 31 U.S.C. §§ 3730(b)(1) and (b)(2), and for himself and the State of California, and all California political subdivisions that purchased services from Iron Mountain during the period 2001 to the present, pursuant to Cal Gov't Code § 12652(c). Mr. Stanley was employed by defendant Iron Mountain Records Management, Inc. from May 2001 to March 2009, acting as a Global Account Executive for most of that time period. As such, Mr. Stanley handled some of Iron Mountain's largest accounts and was familiar with Iron Mountain's pricing, including its lowest prices offered to its customers, as well as other Iron Mountain corporate practices.

27.     Relator Patrick McKillop is a resident of Arizona and a United States citizen. Relator McKillop is bringing this civil action for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, for himself and on behalf of the United States Government, pursuant to 31 U.S.C. §§ 3730(b)(1) and (b)(2), and for himself and the State of California and all California political subdivisions that purchased services from Iron Mountain during the period 2001 to the present, pursuant to Cal. Gov't Code § 12652(c). Mr. McKillop has been working in the

document storage industry for over 30 years.  In that capacity, he often has competed with Iron Mountain for business, has interviewed, worked with, and spoken with many current and former Iron Mountain employees, and has otherwise become familiar with Iron Mountain's pricing to particular customers and with Iron Mountain's business practices.

## STATEMENT OF FACTS
## I.  FEDERAL FALSE CLAIM ACT VIOLATIONS

**A.     The GSA Multiple Award Schedule (MAS) Program and Relevant Contract Terms and Regulations**

28.     Executive agencies of the United States may procure products and services only through full and open competition, unless certain exceptions apply. 41 U.S.C. § 253(a)(l).

29.     The competitive bidding process, and the negotiation of contractual terms, is a lengthy and costly process.  In order to expedite the procurement process for executive agencies, and for contractors wishing to sell products to executive agencies, the General Services Administration of the United States (GSA), through the Federal Acquisition Service, solicits, negotiates, awards, and administers Multiple Award Schedule (MAS) contracts to procure products and services for federal agencies. 41 U.S.C. § 251, *et seq.*; 40 U.S.C. § 501(b).

30.     Under the MAS program, GSA negotiates prices and contract terms that will apply to subsequent orders placed for all of the items that are covered by the MAS contract.  The list of products or services that are available for purchase under a particular MAS contract is referred to as the contract "schedule."  The pre-negotiation of the terms of sale for a large number of products and services under the MAS program saves a significant amount of administrative time for Government agencies ordering off of MAS contract schedules and for contractors wishing to sell products to the Government.

31.     The MAS program allows the Government to obtain commercial supplies and services at prices associated with volume buying.  41 U.S.C. § 259(b)(3).  Additionally, agencies placing orders under MAS contracts are considered to meet the requirements of full and open competition.  48 C.F.R. § 8.404(a).  Thus, contractors also benefit from the MAS program, because they do not have to compete in sealed bidding or negotiated acquisitions, and their products are more widely available to federal agencies, making it easier for the agencies to place orders.

32.     Orders under MAS contracts are submitted by executive agencies directly to contractors such as Iron Mountain.  48 C.F.R. § 8.406-1.

33.     The Administrator of GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow in order to participate in the program.  40 U.S.C. §§ 121(c), 501(b)(2).  These rules and regulations are set forth in the Federal Acquisition Regulations (FAR) and the General Services Administration Acquisition Manual (GSAM).

34.     GSA initiates the MAS process by publishing a contract solicitation. Interested contractors then submit responses to the solicitation to GSA.  Any contractor that enters into an MAS contract with the United States Government must abide by, *inter alia*, 1) the obligations that are outlined in the Government's solicitation; 2) the FAR and GSAM clauses that are incorporated into the contract; 3) any additional requirements negotiated between the parties; and 4) any other general federal contracting requirements set forth in the applicable regulations and laws.

**Commercial Sales Practices Information**

35.     The MAS contract solicitation requires prospective contractors to provide GSA with extensive information about their commercial sales practices, including price and discount information, with respect to all customers of the contractor.  *See* Form CSP-1, Commercial Sales Practices Format.  "A 'customer' is

any entity, except the Federal Government, which acquires supplies or services from the Offeror.  The term customer includes, but is not limited to, original equipment manufacturers, value added resellers, state and local governments, distributors, educational institutions (an elementary, junior high, or degree granting school which maintains a regular faculty and established curriculum and an organized body of students), dealers, national accounts, and end users."  FAR Figure 515-4, Instructions for Commercial Sales Practices Format.

36.    Specifically, a prospective contractor must represent that the prices it is offering the Government "are equal to or better than [the contractor's] best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions," and must identify the customer or category of customers which receive its best price and provide details regarding the terms of that pricing.

37.    If the prices the contractor is offering the Government are *not* equal to or better than the best price offered to any other customer, then the contractor must provide the Government with detailed information regarding pricing "for all customers or customer categories to whom you sell at a price (discounts and concessions in combination) that is equal to or better than the price(s) offered to the Government under this solicitation or with which the Offeror has a current agreement to sell at a discount which equals or exceeds the discount(s) offered under this solicitation."  This pricing information includes the identity of the customer or category of customers, the discounts and concessions offered, the volumes/quantities of sales, and other contract terms.  *Id.*

38.    Prospective GSA MAS contractors must certify to the Government that the information provided is "current, accurate and complete" as of 14 days prior to its submission and "must also disclose any changes in [the contractor's] price list(s), discounts, and/or discounting policies which occur after the offer is submitted but before the close of negotiations."  *Id.*  GSA contracting officers use

the certified pricing information provided by prospective MAS contractors to negotiate MAS contract prices.

39.     Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)."  Although a contract may under certain conditions be awarded at less favorable pricing, to relators' knowledge, such conditions were not met in this case.  48 C.F.R. § 538.270(d).

40.     In negotiating the terms of an MAS contract, the contracting officer must determine whether the price offered to GSA is reasonable by "compar[ing] the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers."  48 C.F.R. § 538.270(c).  GSA contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offeror regarding its commercial sales in negotiating the terms of an MAS contract.  *Id.*

**Price Reductions Clause**

41.     The MAS contract provides that if, subsequent to formation of the contract, GSA discovers that the information provided to the contracting officer at the time of negotiation was not current, accurate, and complete, the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract.  The amount of the reduction is the amount by which the Government orders were inflated as a result of the inaccurate or undisclosed information.  48 C.F.R. § 552.215-72; GSAM 552.238-75(c).

42.     The regulations governing MAS contracts include a mechanism that is known as the "Price Reductions Clause."  GSAM 552.238-75 states in part as follows:

**Price Reductions**

(a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the

basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained throughout the contract period. Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award.  The Contractor's report shall include an explanation of the conditions under which the reductions were made.

43.    As set forth above, the regulations require the contracting officer and the offeror to agree upon 1) the customer or category of customers which will be known as the "Basis of Award" (BOA) customer, and 2) a fixed relationship between the prices that the offeror gives to the BOA customer and those that it gives to the Government.  These agreements initially are based on the commercial sales practices information provided by the contractor in response to the solicitation and prior to contract award.

44.    If, during the period that the contract is in effect, the Contractor offers the BOA customer prices, discounts, or other terms that are better than those previously offered to the BOA customer, the prices that are offered to the Government must be adjusted accordingly.  Any such change offered by the Contractor to the BOA customer must be reported to the Government no later than 15 days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the BOA customer.  GSAM 552.238-75(f).

45.    In addition to the requirement that the Contractor inform the Government of any changes in prices offered to the BOA customer, the Price Reductions Clause also requires the Contractor to report any changes in the

commercial pricing practices or policies that were disclosed to GSA during pricing negotiations:

>(1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor-

>>(i) Revises the commercial catalog, pricelist, schedule or other document upon which the award was predicated to reduce prices;
>>(ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or
>>(iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award.

>(2) The Contractor shall offer the price reduction to the Government with the same effective date, and for the same time period, as extended to the commercial customer (or category of customers).

GSAM 552.238-75(c).

**Economic Price Adjustment Clause**

46.     The MAS contract provides a mechanism for a contractor to request price increases during the course of the contract.  FSS Clause Manual, I-FSS-969, Economic Price Adjustment—FSS Multiple Award Schedule.  Pursuant to the Economic Price Adjustment clause of the contract, each time a price increase is requested, the contractor is required, *inter alia*, to provide either a new CSP-1 form with new data regarding its commercial sales practices, or "a certification that no change has occurred in the data since completion of the initial negotiation or a subsequent submission."  FSS Clause Manual, I-FSS-969(e).  Price increases may be requested up to three times during each succeeding 12-month period of the contract.  I-FSS-969(d).

**Obligation to Notify Government of Overpayments**

47.     The MAS contract also includes a provision requiring the contractor to identify immediately any overpayments by the Government, as follows:

> Overpayments.  If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the ordering activity has otherwise overpaid on a contract financing or invoice payment, the Contractor shall immediately notify the Contracting Officer and request instructions for disposition of the overpayment.

FAR 52.212-4(i)(5).

**Evergreen Clause**

48.     Upon award, the MAS contract is in effect for an initial period of five years.  The MAS contract further provides for the Government, at its option, to extend the term of the contract for an additional five-year period, which option may be exercised up to three times.  The option shall only be exercised on the condition that:  "It is determined that exercising the option is advantageous to the Government considering price" and other factors, including the contractor's performance under the contract.  I-FSS-163.

49.     When the Government exercises its option to extend the contract, the prices that are in effect at the time the option is exercised remain in effect, unless an adjustment is made in accordance with another contract clause, such as the Price Reduction Clause or the Economic Price Adjustment Clause.  *Id.*

**Industrial Funding Fee (IFF)**

50.     All GSA schedule contractors must pay GSA an industrial funding fee (IFF), which is a small percentage of the contractor's total quarterly sales under the contract.  552.238-76.  The purpose of the IFF is to cover the Government's costs of operating the MAS program.  During the time period relevant to the complaint, the IFF was originally 1% and was lowered to 0.75% effective on or about January 1, 2004.

51.   The IFF is included in the price of items and services purchased under an MAS contract and is therefore paid by the government entity making a purchase under an MAS contract.  The GSA contractor is then responsible to pass the fee on to the GSA.  To facilitate accurate payment of the IFF to the GSA, GSA schedule contractors are required to report the quarterly dollar value of all sales under the GSA contract (including the IFF), and must pay the IFF to GSA at the same time as submitting the report.  552.238-74 & 552.238-76.

52.   The GSA defines a GSA MAS sale as follows:  "What Qualifies as a Schedules Sale?  If the product or service falls within the description of the SINs on your contract and the customer is an eligible ordering activity, the sale is a Schedules sale although in some cases, the ordering activity may indicate exceptions to this.  You must have a tracking system and methodology in place that allows you the ability to differentiate between Schedules and non-Schedules sales – correct sales reporting is a contract requirement."

53.   Likewise, the United States Department of Veterans' Affairs (VA) defines a GSA MAS sale as follows:  "What Qualifies as a Schedules Sale?  If the task or delivery order references the FSS [Federal Supply Schedule] contract number, then the entire order should be reported as an FSS sale (this includes sales made under prime vendor, direct-to-patient, and consignment programs).  Non-FSS line items must be annotated as "open market" or "not under contract" and the sales value of these items should be excluded from reported FSS sales.  Additionally, if the product or service falls within the description of the SINs on your contract and the customer is an eligible ordering activity, the order is considered a Schedule sale, although, in some cases, the ordering activity may indicate open market exceptions to this.  You must have a tracking system and methodology in place that allows you to differentiate between Schedule and non-Schedule sales.  Contractors are reminded that proper and timely sales reporting is a contract requirement."

54.     When a federal government customer eligible to purchase under a GSA MAS contract purchases items or services that are on a GSA contractor's GSA MAS contract, the GSA contractor must provide those items or services at the prices, and under all other terms and conditions, of the contractor's GSA MAS contract.  The contractor also must report such a sale as a GSA schedule sale and pay the IFF fee for the sale.

**B.     By its False Statements, Iron Mountain Induced GSA To Enter Into A Contract In 2001 And to Renew the Contract in 2006.**

55.     Pursuant to its authority as described above, GSA issued Solicitation 3FNJ-C1-000001-B for Schedule 36, Office Imaging and Document Solutions ("the Solicitation").   The Solicitation pertained to, *inter alia*, document and records storage, data protection, imaging, and shredding.

56.     In the months prior to September 2001, Iron Mountain provided its proposal to GSA in response to the Solicitation.  As required by the Solicitation and the regulations, the proposal purported to provide GSA with "current, accurate and complete" information regarding the pricing policies and practices that Iron Mountain followed with its commercial customers, *i.e.*, all customers other than the federal government.  Iron Mountain further represented that it provided all information required by CSP-1, Commercial Sales Practices Format and FAR Figure 515-4, Instructions for Commercial Sales Practices Format, as described in detail above.

57.     Based on these representations, GSA and Iron Mountain agreed upon pricing for the MAS contract, including agreeing upon a BOA customer and a fixed relationship between the pricing offered the BOA customer and the pricing offered the Government.

58.     Based on the facts outlined herein, relators allege that Iron Mountain's representations to the GSA regarding its pricing offered to the federal Government

and other customers were false, and Iron Mountain knew the statements were false at the time they were made.  These representations were material to the Government's decision to enter into the contract, and each of these representations was made for the purpose of inducing the Government to enter into the contract and pay the resulting claims.  Moreover, the natural and foreseeable result of Iron Mountain's false disclosures regarding its commercial sales practices was that the United States would overpay for Iron Mountain services provided under the GSA Contract.

59.    In submitting its proposal to the Government, Iron Mountain falsely certified that the commercial sales practice data, and other data, it had submitted was "current, accurate and complete."

60.    In or around September 2001, Iron Mountain was awarded GSA MAS contract number GS-25F-0066M ("the GSA Contract"), effective September 15, 2001 through September 30, 2006.  As initially awarded, the GSA Contract covered Special Items Number (SIN) 51-504b Records Management Services, Storage Services, and SIN 51-507 Destructive Services.

61.    The GSA Contract was subsequently extended for a five-year option period from October 1, 2006 through September 30, 2011 (the "2006-2011 option period").  At the end of this period, rather than exercising its option to extend the contract for another five years, the GSA extended the contract for six months, through March 28, 2012.  Subsequently, the contract was extended for another six-month period, until September 24, 2012, and at this time the GSA pricelist no longer included SIN 51-107 Destructive Services.  Subsequently, in or around September and October 2012, GSA and Iron Mountain agreed on new pricing for the contract, and the contract was extended for the remainder of the applicable five-year option period, through September 30, 2016.

62.    Prior to the Government's decision to exercise its option to extend the GSA Contract for the 2006-2011 option period, Iron Mountain was required to

reaffirm to the Government that its commercial sales practice information, and the relationship of the Government's pricing to its BOA pricing, had not changed.  Iron Mountain did not correct the false representations as to its pricing and commercial sales practices prior to the Government determining that it would exercise its option to extend the GSA Contract for the 2006-2011 option period.

63.    Based on Iron Mountain's false disclosures regarding its pricing and commercial sales practices, and its false certification that these disclosures were accurate, complete and current, GSA agreed to the pricing terms set forth by Iron Mountain for the 2006-2011 option period.  These prices remained in effect until in or around October 2012, when GSA exercised its option to extend the contract through September 30, 2016, and GSA and Iron Mountain agreed to new pricing, which remains in effect at this time.

64.    The Government's determination to exercise its option to extend the GSA Contract for the 2006-2011 option period was based on Iron Mountain's continuing false representations to the Government regarding its commercial sales practices and prices to other customers, which Iron Mountain knew to be false at the time it made them.  These false representations were material to the Government's decision to extend the contract, and each of these representations was made for the purpose of inducing the Government to extend the contract and to pay the resulting claims.  Moreover, the natural and foreseeable result of Iron Mountain's false disclosures regarding its commercial sales practices was that the United States would overpay for Iron Mountain services provided under the GSA Contract.

65.    When GSA agreed to the GSA Contract initially and subsequently exercised its option to extend the contract term for the 2006-2011 option period, it relied to its detriment on material false statements by Iron Mountain regarding the identity of, and pricing terms offered to, Iron Mountain's other customers, including the BOA customer.  The pricing agreed to for the 2006-2011 option

period remained in effect for the two additional six-month extensions referenced above, until in or around October 2012.

66.     In reliance on Iron Mountain's false statements and its misrepresentations of its commercial sales practices, GSA was induced to believe that Iron Mountain's certifications were accurate, which they were not, that information provided by Iron Mountain regarding its overall commercial sales practices was "current, accurate and complete," which it was not, and that Iron Mountain's certifications of its commercial sales practices with regard to the BOA customer were "current, accurate and complete," which they were not.

67.     False and incomplete information regarding Iron Mountain's pricing and commercial sales practices was material to the United States' decision to enter into the GSA Contract and to extend the GSA Contract for the 2006-2011 option period, to the United States' agreement as to the pricing under the GSA Contract, and to the United States' decision to make payments under the GSA Contract.  The prices agreed to for the 2006-2011 option period generally remained in effect through at least two additional extensions until in or around October 2012, when GSA exercised its option to extend the contract through September 30, 2016, and GSA and Iron Mountain agreed to new pricing, which remains in effect at this time.

**C.    Iron Mountain Reiterated and Confirmed False Statements Over the Period of the GSA Contract.**

68.     Iron Mountain repeatedly reaffirmed its false statements and misrepresentations of its commercial sales practices to induce the GSA to continue to accept the discounts and pricing that Iron Mountain had proposed under the GSA Contract.

69.     The GSA Contract provides for Iron Mountain to request price increases during the course of the contract.  Pursuant to the Economic Price

Adjustment clause of the contract, each time a price increase is requested, Iron Mountain is required to, *inter alia*, submit new commercial sales practice data showing the relationship between the proposed price increase and its commercial sales practices, or to certify that no change had occurred in the data since completion of the initial negotiation or a subsequent submission.

70.     During the course of the GSA Contract, Iron Mountain has requested and received from GSA price increases at least three times, executing contract modifications which included price increases on May 31, 2007, August 27, 2010, and September 13, 2011.  A copy of Iron Mountain's pricelist for the GSA Contract effective as of May 31, 2007, is attached as Exhibit 1.  A copy of Iron Mountain's pricelist for the GSA Contract which was current through Modification No. 32, executed August 27, 2010, is attached as Exhibit 2.  A copy of Iron Mountain's pricelist for the GSA Contract which was current through Modification No. 44, executed September 13, 2011, is attached as Exhibit 4.  A copy of Iron Mountain's pricelist for the GSA Contract, which is current through Modification 56, executed October 10, 2012, is attached as Exhibit 7.

71.     As of May 31, 2007, GSA and Iron Mountain had agreed to a total of at least nine modifications to the GSA Contract.  As of August 27, 2010, GSA and Iron Mountain had agreed to a total of at least 32 modifications to the GSA Contract.  As of September 13, 2011, GSA and Iron Mountain had agreed to a total of at least 44 modifications to the GSA Contract.  As noted above, modifications to increase prices may be requested up to three times in a 12-month period.  Upon information and belief, in addition to the known price increases on May 31, 2007, August 27, 2010, and September 13, 2011, one or more of the nine modifications prior to May 31, 2007, and one or more of the additional 23 contract modifications between May 31, 2007 and August 27, 2010, and one or more of the additional 12 modifications between August 27, 2010 and September 13, 2011 were also price increases.

72.     In connection with each price increase, as required by the terms of the GSA Contract, Iron Mountain either submitted new information regarding its commercial sales practices, representing that such information was "current, accurate and complete," or certified that no change had occurred in the data since completion of the initial negotiation or a subsequent submission.

73.     For the reasons discussed in Statement of Facts Section D, *infra*, Iron Mountain's representations and certifications to the GSA in connection with each price increase were false, and Iron Mountain knew they were false.

74.     Information regarding Iron Mountain's pricing and commercial sales practices was material to the United States' agreement to the price increases under the GSA Contract and to the United States' decision to make payments under the GSA Contract.

**D.     Iron Mountain's True Undisclosed Commercial Sales Practices:  Lower Pricing and Greater Discounts Offered to Customers Other Than GSA.**

75.     Despite Iron Mountain's express certifications to the contrary, the information that Iron Mountain provided to GSA regarding its commercial sales practices was not accurate, complete, or current, and its actual commercial discounting and pricing policies were not consistent with Iron Mountain's disclosures to the Government.  Instead, as detailed in the examples below, other customers received lower prices than the GSA and greater discounts off of Iron Mountain's retail or "list" pricing for the services offered under Iron Mountain's GSA schedule.

**Storage Rates**

76.     The most significant price term in the GSA Contract regarding storage of hard copy documents, and in hard copy document storage contracts generally, is the charge for storage of one box or carton of documents, or one cubic foot of documents, for a month.  As Iron Mountain explained in a recent SEC filing,

"records management services are comprised primarily of the archival storage of records, both physical and digital, for long periods of time according to applicable laws, regulations and industry best practice. . . .  Hard copy business records are typically stored in cartons packed by the customer for long periods of time with limited activity."  Monthly storage charges typically are the largest component of the billed amount under a document storage contract.

77.     Storage charges accrue every month, often on tens or hundreds of thousands, or even millions, of boxes of stored documents.  Accordingly, even a small difference in the storage charge per cubic foot or box can lead to a significant difference in the amount paid under the contract.

78.     During the course of the GSA Contract, Iron Mountain charged the Government $0.137, or 13.7 cents, per cubic foot per month for standard (not climate-controlled) storage (Contract Line Item Number (CLIN) 004A; May 2007 GSA Pricelist, Exhibit 1).

79.     Other customers, however, were offered lower rates than the GSA for document storage.  During the same time period GSA was paying 13.7 cents per cubic foot for monthly storage, other Iron Mountain customers were paying less than that amount.

80.     For example, Iron Mountain's most favored customers typically include its "Global Accounts."  Global Accounts include most of Iron Mountain's largest volume customers, and may also include accounts with a smaller volume but which are viewed as having a high potential for growth.  As a Global Account Executive, relator Stanley knew the prices offered to the Global Accounts he handled, as well as other Global Accounts, and is aware of at least two Iron Mountain Global Account customers (JP Morgan Chase and Citicorp), who received better monthly storage pricing than the GSA, with one customer (JP Morgan Chase) paying less than 10 cents per cubic foot -- more than 25% less than the GSA price.  Relators McKillop and Stanley are also aware of other Iron

Mountain customers with better monthly storage pricing than GSA (including AIG; Ohio Office of Procurement Services; Maricopa County, Arizona; City of Los Angeles, California; and Viacom International, Inc.), including one customer paying less than 12 cents per cubic foot (Maricopa County, Arizona).

81.    For at least the period October 2010 through the date of the complaint and ongoing (and possibly starting earlier), Iron Mountain has been charging the Government $0.27, or 27 cents, per cubic foot per month for storage (CLIN 06, GSA Pricelists Exhibits 2 & 4; RM02, Exhibit 7).  As stated in the pricelists, the 27 cent rate is for National Archives and Records Administration (NARA)-compliant storage, which means storage that complies with requirements set forth at 36 C.F.R. Part 1234, concerning matters such as fire suppression, environmental controls, security, etc.  Upon information and belief, Iron Mountain began charging the Government the 27 cent rate as of October 1, 2009, the date the NARA requirements became effective, and possibly earlier than that date.

82.    Iron Mountain has several storage facilities which are NARA-compliant; however, most Iron Mountain storage facilities are not NARA-compliant.  Iron Mountain's GSA pricelists starting at least as of the pricelist current through Modification 32, executed August 27, 2010 (Exhibit 2), included only the 27 cent NARA-compliant storage rate and no longer listed the 13.7 cent standard, non-NARA-compliant rate.

83.    Relators are informed and believe that, since instituting the 27 cent NARA-compliant rate, Iron Mountain has been overcharging the Government by charging 27 cents for storage of all boxes, including "legacy" boxes that were already housed in, and remain in, non-NARA-compliant facilities and other documents stored in non-NARA-compliant facilities.  Likewise, relators are informed and believe that Iron Mountain has been allowing customers other than federal government GSA customers to store documents in Iron Mountain's NARA-

compliant facilities at a rate of less than 27 cents, in violation of Iron Mountain's obligations to offer its lowest prices to GSA customers.

84.    Iron Mountain also offered customers other than the Government lower prices on climate-controlled storage.  During the course of the GSA Contract, Iron Mountain has been charging the Government $1.16 per cubic foot per month for climate-controlled storage, which is a separate line item on the GSA contract.  (CLIN 004B, May 2007 GSA Pricelist, Exhibit 1; CLIN 02, Exhibits 2 & 4).  Other customers (including Fourth Court of Appeals, Texas; Metropolitan Transit Authority, Texas; Bexar County Appraisal District, Texas; Texas Workforce Commission, Texas; Health and Human Services, Texas; Maricopa County, Arizona; City of Los Angeles, California) paid up to 88% less for climate-controlled storage.

85.    In addition, Iron Mountain has followed a pattern and practice of charging customers for storage at the much higher climate-controlled rate, when the documents for which such charges were claimed were not in fact stored in climate-controlled space but were merely in regular storage space.  Accordingly, relators allege on information and belief that Iron Mountain charged the Government for climate-controlled storage when the documents for which such charges were claimed were not in fact stored in climate-controlled space.

86.    In the most recent version of its GSA pricelist (Exhibit 7), the line item for climate-controlled storage has been deleted, indicating that Iron Mountain is no longer offering this service under the GSA Contract.

**Permanent Removal Charges**

87.    Another significant line item in terms of determining whether other customers were offered greater discounts and better terms than the Government is the "permanent removal" charge.  The permanent removal charge refers to the charge to remove a box of stored materials from Iron Mountain's custody, and

either transfer it back to the permanent custody of the Government customer, or transfer the box to another document storage company.

88.     Once a customer stores a box of documents with Iron Mountain, if the customer wants to move those documents to another document storage vendor to obtain better pricing or other terms, it first must pay Iron Mountain the permanent removal fee for each and every box.  When the permanent removal charge is relatively high, it could cost tens or even hundreds of thousands of dollars for the customer to move its records to a vendor other than Iron Mountain.  The total cost for a customer to move all of its documents to another vendor is often equivalent to the cost to continue storing the documents with Iron Mountain for another five years, or even longer.  Even when switching to another vendor with lower prices, the customer will not begin to see any savings until the permanent removal charge is recouped, which will take many years if the permanent removal charge is high. The permanent removal charge is accompanied by a "retrieval" charge which compensates Iron Mountain for the work involved in accomplishing the permanent removal of files; the "permanent removal" fee is in addition to the "retrieval" charge.  For these reasons, these charges effectively hold the customer "hostage" to Iron Mountain and thus are sometimes referred to as "hostage fees."

89.     A contract term providing for a high permanent removal charge is a significant detriment to the Government, because it tends to operate as a restraint on moving stored materials to any document storage contractor other than Iron Mountain, even if such a move would enable the Government to obtain better pricing or other contract terms.  If, on the other hand, the permanent removal charge is lower, or there is no charge, the Government can more easily move its records to another vendor to take advantage of more favorable pricing or other terms offered by that vendor.   It is not a solution for the customer to retrieve boxes temporarily from Iron Mountain, as storage charges continue to accrue even while

boxes are physically in possession of the client, until the point of permanent removal.

90.    Iron Mountain views the permanent removal fee as a cornerstone of its business, essentially enabling it to hold its customers "hostage" and prevent them from transferring their business to other document storage vendors.  The permanent removal charges are deliberately set at a high level, such that the cost for an Iron Mountain customer to switch to another vendor is a strong deterrent to doing so.

91.    In order to permanently remove a box of documents, GSA must pay both a "retrieval fee" to retrieve the box and the permanent removal fee.  Thus, under the GSA Contract, the total "permanent removal" fee charged to the Government (including the retrieval fee) was $7.34 per container (CLINs 0006A & 007; May 2007 Pricelist, Exhibit 1), and later was $7.33 per container (or $6.11 per cubic foot) (CLINs 11 & 16, Exhibits 2 & 4).  In the most recent pricelist, the "permanent removal" fee (including retrieval) is $5.676 per container, or $4.73 per cubic foot (RM08 & RM13, Exhibit 7).

92.    By contrast, at the time Iron Mountain negotiated the GSA Contract and during the course of the GSA Contract continuing through the date of the complaint and ongoing, other customers' permanent removal fees were far lower. Other Iron Mountain customers' contracts provided for permanent removal charges, including retrieval (which some customers receive at no charge), which were approximately 40% to 85% lower than those paid by GSA (Maricopa County, Arizona; Orrick, Herrington [law firm]; Wayne County, Michigan Family Independence Agency; Colorado Office of Consumer Counsel; City of Los Angeles, California; Larry Flynt Publishing; Second District Court of Appeals, Los Angeles, California; Fourth Court of Appeals, Texas; Bexar County Appraisal District, Texas; Health and Human Services Commission, Texas; Gallagher & Kennedy [law firm]; Arizona Public Service Company; Viacom International, Inc.;

University Medical Center of Southern Nevada; Holland & Knight [law firm]; Los Angeles County, California).

93.    Compared to Iron Mountain's "list" or "retail" prices for permanent removal, the GSA permanent removal charge of $7.33 per container which was in effect from at least May 2007 until recently represented a 30% discount, while the other customers listed above received discounts of up to 90%.  Although the charge was lowered in the latest version of the pricelist (Exhibit 7), Iron Mountain continues to offer customers other than its GSA customers much lower permanent removal fees.  In addition, Iron Mountain sometimes grants other customers a complete or partial waiver of the permanent removal charge, *i.e.*, Iron Mountain does not include any permanent removal fee in the customer's contract.  Iron Mountain's practice of granting such complete or partial waivers to customers other than the GSA is ongoing.

94.    Because of the restraining effect of the permanent removal charge on the Government's ability to obtain better prices and terms from vendors other than Iron Mountain, the discrepancies in this term alone demonstrate that other Iron Mountain customers were and are being treated more favorably than the Government.  As a result of its inflated permanent removal fees, Iron Mountain received monthly payments from the United States for storage and related charges that it would not have received had the United States changed services to a provider with lower costs or other more favorable contract terms, which would have been the natural tendency of the United States had it not been restrained by the over-inflated permanent removal charges.  The damages to the Government resulting from not switching to another contractor were in addition to overcharges resulting from Iron Mountain charging the Government inflated permanent removal fees instead of the lower prices charged to other customers.

**Ancillary Services**

95.     Iron Mountain also offered lower prices to other customers on ancillary services, such as retrieval/handling charges and transportation (pick-up and delivery).  After document storage, transportation and handling charges typically make up the highest percentage of billings under a document storage contract.

96.     The Iron Mountain customers who received lower prices than GSA on pick-up/delivery and handling charges include:  Maricopa County, Arizona; Larry Flynt Publishing; Wayne County, Michigan Family Independence Agency; Fourth Court of Appeals, Texas; Bexar County Appraisal District, Texas; Metropolitan Transit Authority, Texas; Health and Human Services Commission, Texas; University Medical Center of Southern Nevada; and City of Los Angeles, California.

97.     The Iron Mountain customers who received lower prices than GSA on retrieval charges include:  Larry Flynt Publishing, Maricopa County, Arizona; Arizona Public Service Company; Orrick, Herrington [law firm]; University Medical Center of Southern Nevada; City of Los Angeles, California; Viacom International, Inc.; Gallagher & Kennedy [law firm]; Wayne County, Michigan Family Independence Agency; Fourth Court of Appeals, Texas; Bexar County Appraisal District, Texas; Texas Workforce Commission, Texas; Metropolitan Transit Authority, Texas; Health and Human Services Commission, Texas; Holland & Knight [law firm]; and Los Angeles County, California.

**Document Destruction/Shredding**

98.     Iron Mountain also charged other customers less than GSA on its document destruction (shredding) services.  The Iron Mountain customers who received lower prices than GSA for offsite shredding services include:  The Marshall Retail Group, Las Vegas, Nevada; Maricopa County, Arizona; Bexar

County Appraisal District, Texas; Texas Workforce Commission, Texas; Texas Real Estate Commission, Texas; Health and Human Services Commission, Texas; and the County of Santa Clara, California

**Administrative Fees and Minimum Fees**

99.    In addition,  since at least August 2010, Iron Mountain has been charging the Government an administrative fee of $25.31/month (GSA Pricelist CLIN 08, Exhibits 2 & 4; RM) and is currently charging $25.12/month (RM05, Exhibit 7) for "summary billing" on a monthly basis.  During the same time period, if the Government customer wanted "detailed billing," it would have to  pay $63.27/month (GSA Pricelist CLIN 09, Exhibits 2 & 4) or, currently $62.80/month (RM06, Exhibit 7).  Notably, these charges again are higher than those offered to non-GSA customers.  For example, certain customers were charged no monthly administrative fees, including Wayne County, Michigan Family Independence Agency; Viacom International, Inc.; and Larry Flynt Publishing.

100.    In addition to the monthly "administrative fee," the GSA Contract also includes numerous "minimum" charges to be charged to GSA customers on a monthly or other basis.  *See* GSA Pricelists, Exhibits 2 & 4.  These include: CLIN07, $125.94 monthly storage minimum; CLIN21 $12.09 minimum service charge for an Order, excluding transportation services; $25.00 per visit minimum service charge for offsite shredding and $30.00 per visit minimum service charge for onsite shredding (with a possible higher per visit minimum for shredding when less than 5 business days notice is provided).  *See also* Exhibit 7 (RM04, $100.00 monthly storage minimum; RM19, $9.26 minimum service order charge).  Other Iron Mountain customers had lower minimums or no minimums for one or more of these items, including Maricopa County, Arizona; Wayne County, Michigan Family Independence Agency; Viacom International, Inc.; University Medical Center of Southern Nevada; and Arizona Public Service Company.

**Offsite Data Protection**

101.   In addition to storage of traditional paper "hard copy" documents, the GSA Schedule also offers offsite "data protection" services, such as, for example, storage of computer backup tapes.  *See* Exhibit 1, 2007 GSA Pricelist at pp. 10-12; Exhibit 2 at pp. 19-25; Exhibit 4 at pp. 24-28; Exhibit 7 at 15-17.  Other Iron Mountain customers (including BJ's Wholesale, the State of Massachusetts and a State of California customer) also paid less than GSA for these services.

102.   At the time Iron Mountain entered into the GSA Contract in 2001 and at the time the GSA Contract was extended in 2006, Iron Mountain was providing prices to other customers that were significantly less than the prices agreed to by the GSA for the GSA Contract, including but not limited to the examples cited above, but provided false and incomplete information to the GSA which failed to reveal these lower prices.  Had the GSA known that the information provided by Iron Mountain was false and incomplete, the GSA would not have entered into or extended the GSA Contract, would not have agreed to the pricing structure in the GSA Contract, and would not have made payments to Iron Mountain at the prices agreed to in the GSA Contract.  At the time it requested price increases, including price increases effective in May 2007 and October 2010, Iron Mountain was providing prices to numerous other customers over a wide geographical area that were significantly less than the increased prices agreed to by the GSA for the GSA Contract; however, Iron Mountain was not informing GSA of, or passing on to GSA, these lower prices, as required by the Price Reduction Clause.  Had the GSA known that the information provided by Iron Mountain was false and incomplete and that Iron Mountain was not complying with the Price Reductions Clause, the GSA would not have agreed to the pricing structure in the GSA Contract or to the price increases and would not have made payments to Iron Mountain at the prices agreed to in the GSA Contract, which continued in effect until at least in or around

October 2012.  Iron Mountain continues to offer customers other than the GSA prices that are lower than the prices on its most recent pricelist, Exhibit 7.

**E.**   **Iron Mountain Knowingly Offered Other Customers Lower Prices than GSA.**

103.   Iron Mountain contracts under which other customers received better pricing than that offered to the Government under the GSA Contract were in place: a) during the time period when Iron Mountain was originally negotiating the GSA Contract (prior to October 2001); b) at the time of the Government exercising its option to extend the GSA Contract (October 2006); and c) during the entire course of the GSA Contract and continuing through the 2006-2011 option period; d) during  at least two extensions of the contract prior to the Government exercising its next five-year option in or around October 2012; and e) at the time of the Government exercising its second five-year option in 2012 to extend the contract through 2016, and through the date of the complaint and ongoing, including at the time of modifications to increase contract prices, which include but are not limited to price increases effective as of May 2007 and August 2010.

104.   Moreover, these other contracts offering lower prices than those offered to GSA were negotiated or re-negotiated, renewed, and extended numerous times throughout the course of Iron Mountain's GSA Contract.  Contracts with pricing lower than the GSA pricing were stamped "approved" by Iron Mountain's legal department.  Thus, Iron Mountain clearly had contemporaneous knowledge at the time of the original Contract negotiations, the two five-year renewals of the GSA Contract, and at the time of price increases, that it was offering other customers significantly better terms than GSA.

105.   Despite its obligations under its GSA contract, to report its lowest prices to the Government and to adjust GSA prices downward in the event lower prices were offered to other Iron Mountain customers, Iron Mountain had no, or

inadequate, procedures in place to ensure that other customers were not offered lower prices than GSA or to keep track of such pricing.

106.   For example, Iron Mountain's training programs for its nationwide sales force, *i.e.*, the people who priced and entered into contracts with other Iron Mountain customers, made no mention of the need to make sure that prices offered to other customers were not lower than those offered to the Government under the GSA Contract.  In addition, Iron Mountain knowingly allowed pricing decisions to be made at a local level throughout the United States without any system of oversight in place to ensure that such pricing was in accord with the GSA Contract.

107.   Iron Mountain management at the highest levels, including former Chief Executive Officer Richard Reese, were aware of lower prices offered to customers other than GSA.  For example, during his employment at Iron Mountain, relator Stanley attended an internal meeting in or around September 2003 regarding the pricing of a large Iron Mountain Global Account contract that was coming up for renewal.  At the meeting, several Iron Mountain Global Account contracts which had pricing lower than the GSA pricing were discussed.  Another Iron Mountain employee asked how the low prices offered to these customers would affect the Government business.  Mr. Reese made a statement to the effect that the lower prices would have to be "kept off the radar" so that Iron Mountain would not have to offer the Government the same prices.  Iron Mountain subsequently extended the Global Account contract that was up for renewal, with the pricing during the renewal period (and during the remainder of Stanley's employment at Iron Mountain) remaining below the price offered to the GSA.

108.   In addition to this specific example, during the course of Mr. Stanley's employment, Mr. Reese was generally aware of the pricing offered to Iron Mountain's Global Account customers, including pricing that was lower than GSA pricing.  In his role as Chief Executive Officer, Mr. Reese reviewed and approved the pricing for the Global Account customers.  Iron Mountain maintained its GSA

pricing at the same levels, despite having lower rates for other customers, including Global Accounts.

109.   During the period relevant to the Complaint, Iron Mountain's internal controls had material weaknesses and were inadequate to monitor and control its compliance with price reduction clauses in its government contracts, including but not limited to the GSA Contract.

**F.     Other federal contracts relied on Iron Mountain's false GSA pricing.**

110.   In addition to GSA contract GS-25F-0066M, Iron Mountain also holds GSA MAS Contract GS-10F-0022X, Logistics Worldwide (LOGWORLD). Contract GS-10F-0022X was entered into with an effective date of October 28, 2010 and is currently in effect through October 27, 2015.  Exhibits 5 and 6 are copies of Iron Mountain pricelists for GSA Contract GS-10F-0022X; Exhibit 6 is the pricelist currently in effect.

111.   Under Contract GS-10F-0022X, Iron Mountain offers offsite data protection services, which, as stated above, is one of the categories of services offered under GSA contract GS-25F-0066M and as to which Iron Mountain failed to inform the Government of lower prices offered to customers other than the United States.

112.   At the time Iron Mountain initially entered into Contract GS-10F-0022X in October 2010, it offered the same offsite data protection services, at the same prices, as were available under the GSA Contract GS-25F-0066M.  The same prices originally set for contract GS-10F-0022X based on the GS-25F-0066M pricing continue in effect to the date of the complaint and ongoing.  As the pricing of Contract GS-10F-0022X was based on that of contract GS-25F-0066M, the same conduct and practices of Iron Mountain detailed above with respect to GSA Contract GS-25F-0066M also led to the submission of false claims under GSA Contract GS-10F-0022X.

113.   Iron Mountain also made false claims for payment under other federal contracts as to which the pricing of the contracts was based upon the pricing of Iron Mountain's GSA contract GS-25F-0066M and/or GS-10F-0022X, including both contracts with federal entities and other contracts paid for in whole or in part with federal funds.  The parties who entered into these contracts with Iron Mountain based on the GSA pricing did so in reliance on the fact that GSA requires contractors to provide GSA their best prices, as detailed above.  Price was a material term of these contracts, and had the parties who entered into these contracts known that Iron Mountain's GSA pricing was inflated as the result of Iron Mountain's misrepresentations as detailed above, they would not have entered into the contracts with Iron Mountain, or would not have agreed to the same pricing.

114.   In submitting claims for payment under other federal contracts with pricing based in whole or in part on Iron Mountain's GSA contracts, Iron Mountain made, or caused to be made, false statements and/or false claims for payment to the United States.

115.   One example of a contract based on Iron Mountain's GSA pricing is a Blanket Purchase Agreement for document storage in a NARA-compliant facility, awarded to Iron Mountain by SAIC Frederick, Inc. on or about March 11, 2011, after competitive bidding.  *See* Exhibit 3 (copy of SAIC Frederick, Inc. contract). SAIC Frederick, Inc. is a government contractor and the SAIC contract was awarded under SAIC Frederick, Inc.'s prime contract with the National Cancer Institute at Frederick.  Payments under the contract are made from federal funds.

116.   The contract solicitation documents for the SAIC contract include a blank in which a contractor is to fill in the number of its GSA (or VA) contract, listing its prices offered under the contract, and also provides as follows:  "FSS pricing. SAIC-Frederick, Inc. is eligible for Federal Supply Schedule pricing.  If the services/items offered are on FSS, the contract number must be cited and a copy of the GSA or VA schedule must accompany the offer."  Accordingly, the

SAIC solicitation required Iron Mountain to provide SAIC Frederick, Inc. with a copy of its GSA price schedule.  Relators are informed and believe that SAIC relied upon Iron Mountain's GSA pricing, which, as detailed above, was falsely inflated, in awarding the SAIC contract.  By submitting claims for payment under the SAIC contract while failing to reveal the false pricing on which its GSA contract was based, Iron Mountain caused the submission of falsely inflated claims by SAIC Frederick, Inc. to the Government.

## G.    Overcharging

117.    In addition to the foregoing conduct involving pricing under its GSA contracts, Iron Mountain has also engaged in a corporate pattern and practice of overcharging its customers by various other methods including:  billing for services not provided, billing at rates that are higher than the rates agreed to by contract, and billing for charges that are not allowable under the contract.

118.    Examples of methods by which Iron Mountain has billed for services not provided include:  the above-mentioned practices of charging customers the much higher prices for NARA-compliant or climate-controlled storage when records were not in fact in NARA-compliant or climate-controlled space, but were instead being stored in "regular" non-NARA, non-climate-controlled storage; charging for more volume of storage than is actually being provided by "rounding up" the sizes of boxes or continuing to charge "rounded up" rates for storage of boxes by acquired entities; and, upon information and belief, charging for more expensive "private" storage space when records were not in fact in private storage space.

119.    Examples of methods by which Iron Mountain has billed at rates that are higher than agreed to by contract include:  billing a different, higher price for a service than the price stated in the contract; increasing prices unilaterally without required customer approval and/or in amounts that exceed contractual maximum

increases or more frequently than permitted by contract; in contracts based on open shelf filing, billing for services on a "per file" basis instead of a "per linear foot" basis, resulting in much higher charges.

120.   Examples of methods by which Iron Mountain has billed for charges that were not allowable under the contract include:  billing for a separate "minimum service order charge" or other minimum charge even when the charges billed for the service order exceeded the minimum amount; billing "per trip" charges for a pick-up/delivery when pick-up/delivery wasnot done or requested; performing one service such as a pick-up or delivery, but billing for both a pick-up and a delivery and/or billing the pick-up/delivery charge multiple times to multiple accounts at the same location; billing for monthly administrative fees when none were authorized under the contract; charging the customer a "per file" permanent removal charge in addition to a retrieval charge, when the customer only requested to retrieve the file (and thus should not have been charged any permanent removal charge); and charging a separate retrieval fee in addition to a permanent removal fee when Iron Mountain had made available to customers, or incorporated into their contracts, Iron Mountain's own "Glossary" definition of permanent removal which indicated that retrieval services would be included as part of the permanent removal charge.

121.   Iron Mountain would also use different terminology, pricing units and/or descriptions of its services in different portions of the same contract or bids, or between and among its bids, contracts, invoices, Glossary, and other information provided to customers, resulting in overcharges.  For example, Iron Mountain would bid a contract based on a price per "box" or "carton," but then bill the customer on a per cubic foot rate, resulting in overpayments to Iron Mountain.  Or, Iron Mountain would bid certain line items per "box" or "carton," but then bill all line items on a per cubic foot basis, again to Iron Mountain's benefit.  Contract terms such as "box" and "carton" were not defined.

122.   Iron Mountain also followed a practice of overcharging for offsite data storage.  Under the "records management" section of its GSA Contract, Iron Mountain offered climate-controlled storage at a rate of $1.16 per cubic foot under CLIN02 for "Monthly Storage of Vital Media (e.g. 16mm Roll Film, 35mm Roll Film, Microfiche, Magnetic Media) in climate controlled environment using storage containers."  The CLIN02 service is the same as that offered under the "offsite data storage" section of the contract, *i.e.*, climate-controlled vault storage of computer tapes and other vital media in storage containers.  When charging for storage of backup tapes, though, Iron Mountain would generally use the "offsite data storage" portion of the contract, charging customers on a "per container" basis, which worked out to be a much higher rate than the $1.16 per cubic foot rate available under CLIN02.

123.   Iron Mountain also followed a practice of overcharging by representing to customers that the pricing Iron Mountain was offering or already providing to the customer was GSA pricing or was Iron Mountain's lowest pricing, most favorable pricing, most favorable government pricing, or similar representations regarding pricing, when in fact the prices Iron Mountain charged the customer were higher than the GSA prices then in effect or were not its lowest/best/most favorable prices as represented.  (Moreover, as detailed herein, the GSA pricing itself was already improperly inflated).

124.   The Federal Public Defender in Los Angeles, California is one example of a federal customer to whom Iron Mountain represented that it was offering GSA pricing, when in fact the pricing paid by the customer was higher than GSA pricing.  Moreover, such a sale must be reported as a GSA sale and the IFF must be paid as to that sale.  Upon information and belief, in addition to failing to provide its GSA pricing, Iron Mountain also did not pay the IFF fee for sales under its contract with the Federal Public Defender.  The Federal Public Defender

also provides an example of Iron Mountain overcharging a customer by billing for "per file" permanent removal fees, when only a file retrieval was requested.

125.   In addition, as described above, according to the GSA and VA websites, a sale to a federal customer of a product or service which falls within the description of the SINs on a contractor's GSA schedule contract must be treated as a schedule sale and offered at the prices and other terms applicable to the GSA schedule (unless the customer indicates an exception).  Accordingly, such sales must be made at GSA prices or below, and an IFF fee must be paid on such sales. In the case of Iron Mountain, however, Iron Mountain's total reported sales to the United States during the relevant period exceed the dollar amount of sales reported under its GSA contracts, indicating the vast majority of Iron Mountain's sales were not reported as GSA sales.  Upon information and belief, Iron Mountain also overcharged the United States by selling services that were on its GSA contract at prices higher than the GSA prices (which were themselves inflated), and by failing to report sales of services on its GSA schedule as GSA schedule sales and thus failing to pay the IFF fee.

126.   The overcharging conduct described above was known to Iron Mountain, but was not known to its customers.  As part of the corporate pattern and practice of overcharging, Iron Mountain instructed and trained employees not to refund known overcharges unless such overcharges were discovered by the customer.  Likewise, where overcharges were discovered by the customer, Iron Mountain would correct the problem on a prospective basis only, without refunding past overcharged amounts.

127.   As part of the pattern and practice of overcharging, Iron Mountain also instructed and trained employees not to discuss or explain certain charges. For example, customers were not told that the operation of Iron Mountain's various "minimum charges" would often have the effect of the customer paying more than the listed price for a given service.  Likewise, salespersons were told not to discuss

with customers the fact that, by entering into a contract with Iron Mountain, the customer was incurring a large future liability for "permanent removal" charges that would apply if the customer ever wanted to switch to another vendor, even though such "permanent removal" charges could amount to tens or hundreds of thousands, or even millions, of dollars.

128.    Due to a number of factors, Iron Mountain knew that it was highly likely that customers would not notice overbillings such as those described herein. These factors include:  most customers assume that Iron Mountain is billing at contractual rates; customers who pay electronically may not even see their bills prior to payment; customers often do not have the resources to conduct audits to determine whether invoiced prices match contractual prices; and the high number of line items in a typical contract and the inconsistent terminology within the contracts and between contracts and invoices made it difficult to audit amounts billed.  Iron Mountain also provides invoices or bills that do not provide the unit prices of services and do not itemize charges. Iron Mountain also discourages customers from seeking detailed itemized invoices or bills.  For example, as detailed above, in the case of GSA, Iron Mountain's fee structure penalizes GSA customers for selecting "detailed" billing, thus incentivizing them to instead choose "summary" billing, which makes it more difficult for GSA customers to verify whether Iron Mountain is charging the same prices agreed to in the GSA Contract. Other federal customers were also charged more for "detailed" billing.

129.    Based on Iron Mountain's corporate pattern and practice of overcharging customers, including federal customers, in numerous ways including those described above, and based on Iron Mountain's corporate pattern and practice of not correcting known billing errors unless they were in Iron Mountain's favor, not explaining to customers how charges worked, not disclosing the customer's liability for permanent removal fees, and charging GSA and other customers more for "detailed" billing, relators allege that Iron Mountain also overcharged the

Government via methods including but not limited to all those described in detail above.  These false billings were facilitated by incentivizing Government customers to order "summary billing" only.

130.   Based on Iron Mountain's corporate pattern and practice of overcharging and concealing its overcharges as described above, relators are informed and believe that Iron Mountain overcharged federal customers under the GSA Contract, under contract GS-10F-0022X, and also under its contracts with other federal entities.  Upon information and belief Iron Mountain also overcharged the United States on its contracts which were funded in whole or part by federal funds, including but not limited to contracts with government subcontractors and hospitals and other entities receiving funding from Medicare, Medicaid, and other federal healthcare programs.

## H.   Damage to the United States Resulting from False Claims and Reverse False Claims by Iron Mountain in Violation of the Federal False Claims Act.

131.   Iron Mountain's false statements and fraudulent conduct in the negotiation and performance of the GSA Contract led to the submission of false claims for payment to the United States totaling millions of dollars.  Price is a material term of the GSA Contract and Iron Mountain's false statements concerning matters related to pricing were material in that they had the potential to affect the United States' decision to enter into the GSA Contract and its payment decisions under the GSA Contract.

132.   As set forth above, the Government relied on false statements made by Iron Mountain in deciding to award the GSA Contract to Iron Mountain and in deciding to exercise its first five-year option to extend the GSA Contract, and Iron Mountain knew that these statements were false at the time that it made them.  Iron Mountain made the false statements for the purpose of inducing the Government to

enter into the GSA Contract and to get the Government to pay the resulting claims. Because the United States was fraudulently induced to enter into the GSA Contract and to agree to the first five-year extension, and because prices entered into during this period continued in effect during all extensions of the Contract up through October 2012, each claim for payment made by Iron Mountain under the GSA Contract during this time period was a false claim.

133.   As set forth above, Iron Mountain had an obligation under the Price Reduction Clause to apply a price reduction to the GSA Contract in the event it granted any other customers more favorable discounts or pricing than the pricing upon which the GSA Contract award was predicated, but Iron Mountain knowingly did not apply such a price reduction.  Each claim made by Iron Mountain under the GSA Contract while in violation of the Price Reduction Clause was a false claim because the prices billed to, and paid by, the Government were higher than agreed to in the GSA Contract.  Because Iron Mountain was offering prices to other customers throughout the entire life of the GSA Contract which were significantly less than the prices offered to GSA customers, and which therefore should have triggered the Price Reduction Clause had Iron Mountain truthfully informed the Government of the lower prices, all of Iron Mountain's claims for payment under the GSA Contract were false claims.  All of Iron Mountain's claims for payment were also false claims because Iron Mountain falsely failed to inform GSA that other customers had no "permanent removal" charge.  Had GSA known this fact, it would have negotiated to have no "permanent removal" charge and would have moved its records to another vendor to secure lower prices.

134.   The United States was damaged on each claim on which the ordering agency received a discount that was less or a price that was higher than it would have received had Iron Mountain made accurate, complete, and current disclosures regarding its non-GSA pricing during the negotiation and performance of the GSA Contract.  Each such claim was a false claim.

135.   The United States was also damaged by Iron Mountain's overcharging practices as described above, including billing for services not provided, billing at rates that are higher than the rates agreed to by contract, and billing for charges that are not allowable under the contract.  In instances where Iron Mountain overcharged the United States, the United States was damaged by the amount charged beyond the amount agreed to in the contracts and by the amount charged for services that were not actually provided.  Each claim under the GSA Contract which included any such overcharges was a false claim.

136.   Iron Mountain failed to inform the Government of known overpayments by the Government on the GSA Contract resulting from Iron Mountain's faulty pricing and overcharging, even though the GSA Contract required Iron Mountain to inform the Government of such overpayments.  Had Iron Mountain informed the Government of such overpayments, the Government would have required Iron Mountain to pay the money back and would have reduced the price going forward.  Iron Mountain's failure to report overpayments, and its submission of subsequent invoices which failed to inform the Government of, or provide a credit for, such overpayments resulted in damages in the amount of the previous overpayments.  Such invoices and claims for payment were reverse false claims.

137.   The time period in which Iron Mountain made false statements and false claims and engaged in fraudulent conduct as described above extends from the negotiation period prior to initial award of the GSA Contract in 2001 and continues through the date of the complaint and is ongoing.

138.   Iron Mountain's total claims for payment, and payments, under the GSA Contract to date have exceeded $55 million.

139.   The executive agencies of the United States Government that have made purchases from Iron Mountain under the GSA Contract to date, and to which

Iron Mountain has made false statements and/or submitted false claims for payment include, but are not limited to, the following:

Department of the Treasury - Internal Revenue Service

Department of Veterans Affairs

Department of Defense

Department of the Interior

Commodity Futures Trading Commission

Department of Homeland Security

Department of Health and Human Services

Environmental Protection Agency

140.   As discussed above, GSA negotiated the prices to be applied to orders placed by Government customers under the GSA Contract, in an effort to obtain the best price for the Government.  GSA, however, is not involved in the ordering process by Government customers.  As a result, GSA is generally not aware of particular purchases by Government customers, and GSA does not receive any of the transaction documents related to particular purchases.  Iron Mountain has this information and these documents.  As described above, relators contend that every claim submitted under the GSA Contract and the first five-year option period and extensions thereof, is a false claim and/or a reverse false claim.

141.   Claims to the United States for payment under GSA Contract GS-10F-0022X were false and/or reverse false claims and caused damages based on pricing violations and overcharging for the same reasons and to the same extent described above for GSA Contract GS-25F-0066M.  The time period during which Iron Mountain made false statements and false claims and engaged in fraudulent conduct with respect to GSA Contract GS-10F-0022X extends from the negotiation period prior to initial award of the contract in 2010 and continues through the present and is ongoing.  Iron Mountain's total claims for payment, and

payments, under the GSA Contract GS-10F-0022X to date have exceeded $2.8 million.

142.   Claims to the United States for payment under other contracts with federal entities were false claims and/or reverse false claims to the extent those contracts relied in whole or in part on the pricing in the GSA Contract and to the extent claims for payment included overcharges as described above.  The United States sustained damages under such other federal contracts for the same reasons and to the same extent described above for the GSA Contract.  The time period during which Iron Mountain made false statements and false claims and engaged in fraudulent conduct with respect to other federal contracts extends from 2001 to the date of the complaint and ongoing.  Iron Mountain's total claims for payment, and payments, under other federal contracts to date are estimated to have exceeded $150 million.

143.   Claims to the United States for payment under contracts with entities funded in whole or in part with federal funds were false claims and/or reverse false claims to the extent pricing on such contracts was based in whole or in part on the pricing in the GSA Contract and to the extent claims for payment included overcharges as described above.  The United States sustained damages under such contracts to the extent amounts falsely claimed by Iron Mountain were paid for with, or reimbursed by, federal funds.  The time period during which Iron Mountain made false statements and false claims and engaged in fraudulent conduct with respect to such contracts extends from 2001 to the date of the complaint and ongoing.

## II.  CALIFORNIA FALSE CLAIMS ACT VIOLATIONS

**A.   Pricing Violations**

**1.     California Multiple Award Schedule (CMAS)**

144.   The State of California has its own multiple award schedules program, California Multiple Award Schedules (CMAS).  The State of California establishes multiple award contracts in accordance with Public Contract Code Sections 10290 *et seq.* and 12101.5.

145.   CMAS contracts are not established through a competitive bid process conducted by the State of California.  Instead, California relies on the pricing of existing federal GSA schedules.  In order to be part of a CMAS award, all pricing, products and/or services offered must have been previously bid and awarded on a Federal GSA schedule.  Each potential CMAS contractor must offer to provide products and/or services at prices based on an existing Federal GSA multiple award schedule.  This schedule is referred to as the "base" contract.  The State of California adds standard contract terms and conditions and procurement codes, policies and guidelines, which results in a CMAS contract.  As to price, in requiring CMAS contractors to offer their services at prices equivalent to GSA prices, California relies on the fact that GSA contractors are required to give the federal government their best price, as detailed above.

146.   When applying for a CMAS contract, a contractor currently must make several certifications, including the following:

All products, services and prices offered by my company under the CMAS contract appear on and meet all requirements expressly stated in the contract for the referenced (base) Federal GSA schedule.
. . .
My company is offering prices for products or services equal to or lower than the prices in the base Federal GSA schedule.
. . .
False Claims:  Section 12650 *et seq.* of the California Government Code provides for the imposition of treble damages for making false claims

against the State.  False claims may also result in immediate termination of this contract.

BY SIGNING BELOW, THE CONTRACTOR CERTIFIES COMPLIANCE WITH THE REQUIREMENTS OF THIS CMAS CONTRACTOR CERTIFICATION, EXHIBIT B (4 PAGES). CALIFORNIA CODE REQUIRES THAT YOU PROVIDE YOUR APPLICATION WITH AN ORIGINAL SIGNATURE.

Upon information and belief, these or similar certifications were in effect during the time period relevant to the Complaint.  Execution of required certifications is a condition precedent to obtaining a CMAS contract.

147.   Once a contractor obtains a CMAS contract, California state and local government agencies can purchase items on the contract directly from the CMAS contractor.

148.   Because CMAS relies on federal GSA schedule pricing, if the pricing on the base contract (*i.e.*, the federal GSA contract on which the CMAS contract is based) is inflated because the contractor did not provide accurate information regarding its commercial sales practices when negotiating or during the course of its GSA contract, or because the contractor is not in compliance with federal pricing terms such as the federal Price Reduction Clause, then California state and local government purchasers under the CMAS contract, who are paying the same prices as the GSA prices, will also be paying inflated prices.  CMAS contracts require that, if the pricing on the base contract is lowered, then the CMAS price must also be lowered.

149.   In addition, during the time period relevant to the Complaint or a portion thereof, CMAS contracts incorporated a price reduction clause providing that if a vendor sells any item covered by the contract at a price below the negotiated contract price to a customer comparable to the State, then the vendor must give the State an equivalent price reduction on all subsequent orders for the balance of the contract period or until the price is further reduced.

150.   California awarded Iron Mountain (specifically, Iron Mountain Information Management, Inc.) CMAS contract 4-07-03-0252A (the CMAS Contract), with an initial contract period from October 15, 2007 through December 31, 2011.  Iron Mountain submitted its GSA contract GS-25F-0066M as the base contract for its CMAS contract and agreed to provide the same pricing under its CMAS contract.  The initial period of the CMAS contract was subsequently extended through December 31, 2012, in anticipation that the GSA Contract would eventually be extended for another five-year option period.  Upon information and belief, the CMAS contract will be or has been extended for an additional period but with the base contract changed to the GSA LOGWORLD contract GS-10F-0022X rather than GSA Contract GS-25F-0066M, and with Iron Mountain now offering data protection services only under the CMAS contract.  As detailed above, the pricing of contract GS-10F-0022X was falsely inflated because it was based on the falsely inflated pricing of contract GS-25F-0066M.  Accordingly, to the extent the base contract for Iron Mountain's CMAS contract is changed to the GS-10F-0022X contract, CMAS pricing is still falsely inflated and damage to CMAS users is ongoing.

151.   In applying for the CMAS contract, Iron Mountain executed the required CMAS certifications.   Upon information and belief, Iron Mountain, thus certified, among other things, that its "prices . . . meet all requirements expressly stated in the contract for the referenced (base) Federal GSA schedule" and that it was "offering prices for products or services equal to or lower than the prices in the base Federal GSA schedule" or substantially the same terms.  If these terms were not specifically certified by Iron Mountain, they were still binding contractual requirements.

152.   Iron Mountain failed to reveal to California that its GSA pricing actually was not valid pricing, as a result of the fact that Iron Mountain was not in compliance with the pricing terms expressly stated in its GSA contract GS-25F-

0066M, which was the base contract for its CMAS contract, including but not limited to the price adjustment and price reduction terms.

153.   These misrepresentations were material to California's decision to enter into the contract and to pay claims under the contract, and were made for the purpose of inducing California to enter into the contract and pay the resulting claims.  Iron Mountain knew that the representations were false when made. Moreover, the natural and foreseeable result of Iron Mountain's misrepresentations was that California would overpay for Iron Mountain services provided under the CMAS Contract.

154.   In deciding to award the CMAS contract, California relied on Iron Mountain's certifications that its GSA pricing was in accordance with GSA contract terms, when in fact Iron Mountain knew that its pricing was inflated and not in compliance with GSA contract terms.  Because California was fraudulently induced to enter into the CMAS Contract, each claim for payment made by Iron Mountain under the CMAS Contract was a false claim.

155.   Iron Mountain had an obligation under its GSA Contract to apply price reductions to its GSA Contract pricing, as detailed above.  Such price reductions would be reflected in CMAS pricing, because CMAS pricing relies on and is the same as GSA pricing, but Iron Mountain knowingly did not apply such price reductions to its GSA Contract.  Iron Mountain also had an obligation under the CMAS Contract to apply a price reduction to the CMAS Contract in the event it granted any other customers more favorable discounts or pricing than the pricing upon which the contract award was predicated, but Iron Mountain knowingly did not apply such a price reduction.  Iron Mountain's CMAS certification was false in that Iron Mountain was not in fact in compliance with the pricing terms of its GSA contract and was not offering pricing equal to or lower than the prices in the base GSA contract.

156.   Each claim made by Iron Mountain under the CMAS Contract while in violation of its price reduction obligations was a false claim.  Because Iron Mountain was violating its GSA and/or CMAS price reduction obligations throughout the entire term of its CMAS contract, all of its claims for payment were false claims.

157.   In addition, when prices under the GSA Contract (which was the "base" contract for its CMAS contract) decreased, Iron Mountain failed to inform its CMAS customers and failed to lower its CMAS prices.  For example, after it entered into the CMAS contract, Iron Mountain substantially decreased its prices for document shredding under the GSA Contract, but failed to lower the price of these services on its CMAS contract.

158.   Iron Mountain submitted claims for payment to state and local government agencies during the period of, and pursuant to, the CMAS Contract.

159.   California state and local government agencies were damaged on each claim on which the ordering agency received a discount that was less or a price that was higher than it would have received had Iron Mountain made accurate, complete, and current disclosures regarding its pricing as required under its GSA contract and the CMAS Contract.

160.   The time period of Iron Mountain's false statements, false claims and fraudulent conduct due to defective pricing under its CMAS Contract extends from the period of negotiating the CMAS Contract prior to its initial award in 2007, and continues through the present.

## 2.    County of Santa Clara

161.   On or about March 1, 2003, the County of Santa Clara entered into Agreement No. 5500001433 for document shredding services.  The contract was originally entered into with Assured Shredding, which was subsequently acquired by Iron Mountain in or around October 2005, at which time the County reassigned the Agreement to Iron Mountain.

162.   The Agreement has been extended and amended several times and is currently in effect through December 31, 2013, with a not to exceed amount of $4,400,000 for the total contract period (March 1, 2003 through December 31, 2013).

163.   In or around 2010, when the County was determining whether to extend the contract and at what price, the County explicitly relied upon the pricing in Iron Mountain's CMAS contract No. 4-07-03-0252A.  The County believed that the prices being offered to it by Iron Mountain represented a significant cost savings for the County because the prices being offered to the County were lower than those on the CMAS contract.

164.   In fact, however, the prices on the CMAS contract were falsely inflated as described above.

165.   Furthermore, Iron Mountain had failed to update its CMAS pricing to reflect reductions in its GSA prices for shredding services.  For example, the Iron Mountain CMAS pricing upon which the County relied for purposes of comparison included the following prices for offsite shredding of a 65-gallon container:  2 to 4 containers, $22.67; 4 to 9 containers $20.15; 10 to 19 containers $17.63; 20 or more containers $15.11.  The price offered by Iron Mountain to the County was $15.90 per container regardless of volume, so the County believed it was achieving a significant cost savings compared to CMAS.

166.   In fact, however, GSA pricing at the time was only $10.00 per 65-gallon container (regardless of number of containers).  Iron Mountain had failed to update its CMAS contract or pricing information to match the reduced GSA prices, as required by its CMAS contract, and it failed to provide the County with an updated pricelist reflecting the current prices.  Moreover, as explained above, even the $10.00 pricing was falsely inflated and was not Iron Mountain's "best price."

167.   As a result of Iron Mountain's failure to update its CMAS pricing to match its GSA pricing, the County believed that it was achieving a significant cost

savings over CMAS pricing, when in fact, the County's $15.90 price was much higher than the $10.00 that should have been the CMAS price.

168.   Had the County known that the true comparison price was only $10.00, and that even the $10.00 price was falsely inflated as a result of Iron Mountain's false representations to GSA, the County would not have agreed to or paid $15.90 per 65-gallon container, and would not have agreed to and paid the other pricing set forth in the contract.

169.   All claims submitted to the County at the falsely inflated prices were false claims.

170.   The County was damaged as a result of Iron Mountain's submission of false claims at inflated prices.

171.   Iron Mountain also has at least one other contract with the County of Santa Clara, Agreement No. 5500001752 for record storage and retrieval services which was entered into on or about October 1, 2008 and is currently in effect through March 31, 2016 with a not to exceed amount of $8,100,000.  Upon information and belief, Iron Mountain also submitted false claims and made false statements to the County in connection with Agreement Nos. 5500001433, 5500001752, and any other contracts between Iron Mountain and the County, as a result of overcharging behavior as described herein.

**3.    City of Los Angeles Contract**

172.   On or about February 15, 2005, Iron Mountain (specifically Iron Mountain Information Management, Inc.) entered into City of Los Angeles Department of General Services Contract No. 58401 for the storage of inactive records of the City of Los Angeles, along with associated retrieval, delivery and other services.  Iron Mountain had also previously provided these services to the City of Los Angeles under Contract 57984, for an unknown period of time prior to February 2005.

173.   The term of Contract No. 58401 was extended to and expired on August 14, 2010.  On August 15, 2010, Department of General Services Contract No. 58401 was transferred to and replaced by Contract C118156 between Iron Mountain and the City of Los Angeles.  Contract C118156 had an initial term until February 14, 2011 with an option for up to three one-year renewal periods.  The contract remains in effect and is believed to be in the second one-year renewal period, which extends until on or about February 14, 2013.  Department of General Services Contracts 57984 and 58401 and City of Los Angeles Contract C118156 are collectively referred to hereafter as the "City of Los Angeles Contract."

174.   Contract No. 58401 included a term which requires Iron Mountain to provide the City with its best government prices, as follows:

MOST FAVORABLE GOVERNMENT PRICES

Supplier shall treat City of Los Angeles as a most favorable customer. Supplier represents that the prices for storage and services furnished to City of Los Angeles under this Agreement are not less favorable than the prices and provisions offered to any of supplier's other customers, unless the other customer receives lower prices or more favorable non-price treatment because of the higher volume of storage and services, after taking into account the cost structure in a single audit and the service requirements profile of other customers.  If supplier offers lower prices or more favorable provisions to any other customers than those are offered to City of Los Angeles under this Agreement (taking into account, volume, account cost structures in single districts and service requirements profiles) for similar storage and services, then supplier agrees to concurrently extend such prices or provisions to City of Los Angeles and this Agreement at City of Los Angeles' option shall be deemed amended to provide such terms to the City of Los Angeles.

Any amounts charged to the City of Los Angeles in excess of rates charged by supplier to any customer for similar services of comparable volume and service requirements profile, as aforesaid, shall be refunded or credited to the City of Los Angeles by supplier.

175.   The City of Los Angeles' General Terms and Conditions for supply contracts include "GTC-13 Most Favorable Government Prices" which, upon information and belief, was incorporated into the City of Los Angeles Contract by amendment or by operation of law.  GTC-13 provides, in relevant part:

> The prices charged the City of Los Angeles on any contract shall not exceed those charged any other government agency.
>
> In the event of a price decline, or if the supplier sells the same products or services to other government agencies under similar quantity and delivery terms and conditions at prices below those stated herein, the supplier shall immediately extend such lower prices to the City of Los Angeles.

176.   The City of Los Angeles' GTCs also include "GTC-14 Price Reductions" which, upon information and belief, was incorporated into the City of Los Angeles Contract by amendment or by operation of law.  GTC-14 provides:

> After the award of a contract, or during the contract term, any material, equipment, or product cost or price list reduction to the supplier shall be offered to the City in a corresponding price reduction.  Periodically, the City may request the supplier to certify in writing that any and all material, equipment, and product cost and price list reductions to the supplier are reflected in the City's prices.

177.   Iron Mountain misrepresented to the City of Los Angeles that it was not offering more favorable prices and terms to other government customers at the time it entered into the City of Los Angeles Contract, and failed to offer the City of Los Angeles the lower prices and other more favorable terms it was offering to other Iron Mountain government customers.  In addition, had Iron Mountain been truthful in its representations to the GSA regarding pricing and commercial practices, then the pricing in the GSA Contract would have been lower, and the City of Los Angeles would have been entitled to the same lower pricing as GSA, pursuant to the Most Favorable Government Prices clause.

178.   Iron Mountain's misrepresentations regarding the pricing and terms offered to other customers were material to the City's decision to enter into the contract and to pay claims under the contract, and were made for the purpose of inducing the City to enter into the contract and to get the City to pay the resulting claims.  Iron Mountain knew that the misrepresentations were false when made.  Moreover, the natural and foreseeable result of Iron Mountain's misrepresentations was that the City would overpay for Iron Mountain services provided under the City of Los Angeles Contract.

179.   In fact, during the time period of the City of Los Angeles Contract, other Iron Mountain government customers were receiving better prices than the City of Los Angeles.  Moreover, in the absence of Iron Mountain's false representations, the pricing under the GSA Contract would have been lower, and Iron Mountain would have been required under the City of Los Angeles Contract to offer these lower prices to the City of Los Angeles.

180.   After relator McKillop alerted the City of Los Angeles that Iron Mountain was offering lower prices to other customers in violation of the terms of its contract, the City Controller conducted an audit and issued an audit report dated September 28, 2012.  The audit concluded that Iron Mountain was not offering lower prices to comparable government customers as defined in the contract.  The audit stated that the Controller "obtained pricing information for all Iron Mountain customers within the Southern California territory who had a storage volume similar to the City of Los Angeles."  However, although the County of San Diego is within the described territory and has a storage volume similar to the City of Los Angeles, the audit did not appear to consider the prices offered by Iron Mountain to the County of San Diego.  During the time period relevant to the City of Los Angeles Contract, the County of San Diego was paying only $0.105 per cubic foot of storage, i.e., far less than the City's price of $0.135 per cubic foot, and less than the lowest price mentioned in the audit, which was $0.130 per cubic foot.  Upon

information and belief, as part of the audit, Iron Mountain should have but did not identify to the Los Angeles Controller the County of San Diego as a comparable customer whose lower prices should have triggered the Most Favorable Government Prices clause.  Had the City known of the County of San Diego prices, it would have concluded that Iron Mountain was in violation of the Most Favorable Government Prices clause, and would have calculated an overpayment in accordance with the terms of the clause.

181.   In deciding to award the City of Los Angeles Contract initially, and in deciding to extend and renew the City of Los Angeles Contract, and most recently in conducting its audit, the City relied on Iron Mountain's representations that it was offering the City its most favorable pricing and other contract terms, when in fact Iron Mountain knew that it was not offering its best pricing and terms. Because the City was fraudulently induced to enter into and not to terminate the City of Los Angeles Contract, each claim for payment made by Iron Mountain under the City of Los Angeles Contract was a false claim.

182.   Iron Mountain also had an obligation under the City of Los Angeles Contract to offer the City reduced pricing and to refund or credit any excess amounts paid by the City of Los Angeles in the event Iron Mountain offered any of its other government customers more favorable pricing and other terms, but Iron Mountain knowingly did not offer such more favorable pricing or terms to the City or provide such refund or credit, and knowingly failed to identify lower prices to the Controller during its audit, including lower prices offered to Iron Mountain's customer the County of San Diego.  Each claim made by Iron Mountain under the City of Los Angeles Contract while in violation of its Most Favorable Government Customer obligations or after failing to provide full and complete information in response to the Controller's audit was a false claim.  Because Iron Mountain was offering more favorable pricing throughout the entire time period of its contract with the City of Los Angeles, all of its claims for payment were false claims.

183.   From the inception of the City of Los Angeles Contract, Iron Mountain made claims for payment to the City under the City of Los Angeles Contract totaling approximately $450,000 or more annually.

184.   The City of Los Angeles was damaged on each claim, because it received a discount that was less or a price that was higher than it would have received had Iron Mountain made accurate, complete, and current disclosures regarding its pricing as required under the City of Los Angeles Contract and the GSA Contract.

185.   Since its inception, Iron Mountain has billed approximately $450,000 per year under the City of Los Angeles Contract.  The current contract, C118156, had a contract limit of $4,000,000 when it was originally entered into for a period until February 14, 2011.  The contract has since been extended twice and was in effect through at least February 14, 2013 and possibly longer.

### 4.   False claims to other California entities as a result of Iron Mountain's pricing violations.

186.   As detailed above, Iron Mountain knowingly violated the "best pricing" terms of its GSA, CMAS, and City of Los Angeles contracts.  In addition, on a corporate-wide level, Iron Mountain had no controls in place to monitor or ensure compliance with Best Price, Most Favorable Price, Most Favorable Government Prices, and other similar "best price" type clauses.

187.   Based on Iron Mountain's pattern and practice of violating its best price provisions and its lack of pricing controls, relator is informed and believes that, to the extent other California state and local entities public entities had contracts with Iron Mountain that included "best price" type provisions and/or were priced based on CMAS or GSA pricing, Iron Mountain also violated such pricing provisions.  The identity of each California contract with such provisions is known to, and is within the control of defendant.

188.   Claims for payment by Iron Mountain to California state and local entities with "best price" type provisions were false because the prices charged by Iron Mountain were not in fact the "best prices."  Likewise claims for payment by Iron Mountain to California state and local entities with contract provisions calling for pricing equal to CMAS or GSA pricing, or which were otherwise based on CMAS or GSA pricing, were false because the GSA/CMAS pricing was too high due to Iron Mountain's misrepresentations to GSA as described above.

189.   Each California state and local customer of Iron Mountain was damaged on each such claim, because it received a discount that was lower or a price that was higher than it would have received had Iron Mountain made accurate, complete, and current disclosures regarding its pricing as required under the applicable state or local contract, the CMAS contract or the GSA Contract.

190.   The time period during which Iron Mountain made false statements and false claims and engaged in fraudulent conduct with respect to such contracts extends from 2001 to the present.

## B.   Overcharging Violations

### 1.   County of San Bernardino

191.   Iron Mountain had several contracts with the County of San Bernardino to provide both document storage services and offsite data protection services.  These included Agreement No. 05-039 for storage and retrieval of patient information, medical files, data storage tapes and other materials of Arrowhead Regional Medical Center (ARMC).  Agreement No. 05-039 was entered into for an initial period of January 1, 2005 through June 30, 2008 and was subsequently extended several times and ultimately terminated as of approximately the end of 2012.  Iron Mountain had also provided these services previously since March 9, 1999, under Agreement No. 99-171.  During the period relevant to the Complaint, the County of San Bernardino also had at least four additional contracts

with Iron Mountain including contracts for offsite data storage for various County Departments, including the Information Services Department (ISD), and various sub-accounts of ISD, such as the Risk Management Department, the Sheriff, and the D.A. HelpDesk.

192.   In or around March 2011, the County issued an RFP for document and data storage services.  In responding to the RFP on behalf of his own company, relator McKillop uncovered the fact that Iron Mountain had misrepresented to the County that, in order to switch to a new vendor, the County would have to pay a $2.3 million "permanent removal" fee to Iron Mountain for files stored for ARMC (as well as additional permanent removal fees for other records).  The RFP stated that the vendor who was awarded the contract would have to pay these fees.  Of course, if the contract was awarded to Iron Mountain again, then the fees would not need to be paid, since the records would not be removed from Iron Mountain. Accordingly, in order to be successful, any bidder other than Iron Mountain would not just have to offer the lowest prices, they would have to offer the lowest prices AND pay the $2.3 million fee.  The situation provides a stark illustration of how Iron Mountain holds its customers "hostage" with the permanent removal fees.

193.   In fact, the correct permanent removal fee per the terms of Iron Mountain's contract with the County was not $2.3 million, but was $156,000.  Iron Mountain falsely claimed permanent removal fees on a "per file" basis for the 1,197,198 files in storage instead of the "per linear foot" rate in the contract, based on a unilateral change Iron Mountain had made to the contract.  After relator McKillop brought this matter to the County's attention, the County confronted Iron Mountain about the overcharge and the RFP documents were amended to reflect the correct amount, $156,809.

194.   In addition to Iron Mountain's false claims for permanent removal fees that were not due under the contract, relator McKillop also discovered and brought

to the attention of the County numerous other examples of systematic overcharging by Iron Mountain in violation of its contracts with the County, including:

    a.    Increasing prices beyond a 2% maximum annual increase allowed by contract.  Examples include the following:

- Scheduled trip charge was authorized @ $10.00 per trip and in 4/1/2010 authorized to be increased by a maximum of 2% to $10.20, and in 7/2012 it was billed at $10.92.

- Open Slot Tape Storage was authorized @ $.17 per tape, and in 4/1/2010 authorized to be increased by a maximum of 2% to $.174 per tape, and in 7/2012 the tapes were billed @ $.632 per tape.

- As of December 2010 "Holiday" service was being billed @ $121.85 yet the contract calls for $80.00 plus 2% and charge should be $81.60.

- Documents containers were billed @ $22.33 per container in 12/2010 and in 7/2012 the price jumps up to $29.062 for the same containers. This represents a $318.54 monthly increase for the same item.

    b.    Charging for services that were not listed in Iron Mountain's contract and not authorized to be charged to the County, including but not limited to fuel surcharges and administrative fees.

    c.    Charging for transportation services not provided.  Examples include the following:

- charging for daily transportation visits when service was provided only weekly or otherwise charging for more transportation visits than actually were scheduled or occurred

- charging holiday transportation charges when no transportation services were rendered on a holiday (and also charging $109.20 for transportation on a holiday when the contractual rate was $80.00 or otherwise charging more than contracted holiday rates)

o  charging daily transportation plus a holiday when no services at all were rendered because the County had decided to take possession of data tapes itself and was no longer storing them with Iron Mountain

o  charging for transportation after records had already been returned to, and were in possession of, the County

d.     On open shelf storage contracts, charging the County for more linear feet of storage than was actually being used

e.     Charging for other services that never occurred because the County had already closed the applicable account or subaccount prior to the date for which the services were billed.

f.     Charging for other services not provided and/or in violation of contractual terms.

195.  Relator McKillop reported these and other Iron Mountain overcharges to the County, along with documentation of each, including meeting with the County's auditor to explain the overcharging.  The County has since hired an independent accounting firm to fully quantify the overcharges.  At the County's request, relator McKillop has also met with the independent accountant to explain certain of his own findings to date.

196.  Each claim to the County which included such overcharges was a false claim.

197.  The County was damaged to the extent it paid the amounts falsely charged by Iron Mountain in excess of amounts actually due under the County's contract.

198.  The time period during which false claims occurred extends from Iron Mountain's original contract with the County in 1999 through approximately the end of 2012.

## 2.    1st and 2d District Courts of Appeal (California State entities)

199.   Iron Mountain also misrepresented to state and local customers within the State of California that it was providing them CMAS or GSA pricing when in fact the pricing offered was *not* CMAS or GSA pricing, but was higher than CMAS or GSA.  Examples of customers to whom Iron Mountain made such misrepresentations include the 1st District Court of Appeal in San Francisco and the 2nd District Court of Appeal in Los Angeles, both of which are California state entities.  (As stated above, federal customer Federal Public Defender - Los Angeles is another example of this practice).  In or around 2011 and 2012, and upon information and belief in earlier periods, based on Iron Mountain's representations, both courts of appeal believed that the prices they were paying were Iron Mountain's GSA/CMAS prices and therefore felt that the pricing was fair.  For example, in October 2012, in response to a bidder's question the Second District Court of Appeals stated that it was "operating under the terms of the (California Multiple Awards Schedule) CMAS Contract.  The other signatory to which is the First District.  We will attach a copy of the contract to the Q&A transcript . . . ."  The contract subsequently released was a copy of Iron Mountain's CMAS contract 4-07-03-0252A which also specifically references GSA contract GS-25F-0066M.  As described above, GSA/CMAS pricing is required to represent a vendor's best and lowest pricing in accordance with applicable GSA and CMAS rules.

200.   The Iron Mountain customer ID No. for the 1st District Court of Appeal in San Francisco is SF314.  Iron Mountain entered into a contract with the 1st District in or around April 2004.  Storage prices for the 1st District Court of Appeal, and other line items, were higher than those of CMAS/GSA for at least the period November 2008 through January 2011; upon information and belief, prices were higher than CMAS/GSA for the entire contract period.

201.   The Iron Mountain customer ID No. for the 2d District Court of Appeal in Los Angeles is L4664.  Storage prices for the 2nd District Court of

Appeal, and other line items, were higher than those of CMAS/GSA for at least the period November 2008 through November 2011; upon information and belief, prices were higher than CMAS/GSA for the entire contract period.

202.   In or around the first half of 2012, after being informed by relator McKillop that the prices they were paying were not in fact CMAS/GSA prices but were higher, both the 1st and 2nd District Courts of Appeal confronted Iron Mountain.  In response, Iron Mountain lowered the prices to both the 1st and 2nd District appellate courts.  Storage rates for both courts were lowered to the CMAS rate of $0.137, and some line items were lowered to below CMAS rates.  Other line items, however, were not lowered to CMAS rates, and the prices given to the two courts were not the same on all line items.  Moreover, prices were lowered prospectively only, with no refund for previous charges above CMAS/GSA rates.

203.   In addition, as alleged above, certain CMAS prices were themselves inflated because Iron Mountain failed to lower the CMAS prices when it lowered its corresponding GSA prices, and all GSA and CMAS prices were inflated because of Iron Mountain's misrepresentations to the GSA as described above.

204.   All claims for payment to the 1st and 2nd District Court of Appeals which exceeded GSA/CMAS prices were false claims.

205.   The 1st and 2nd District Court of Appeals were damaged on each such claim to the extent they were overcharged beyond the CMAS/GSA pricing they were promised, and also to the extent the CMAS/GSA pricing itself was inflated as a result of Iron Mountain's misrepresentations to the GSA as described herein.

206.   The time period during which such false claims were made is the entire time period of each court's contract.

### 3.   False claims to other California entities as a result of overcharging violations

207.   As detailed above in Section I.G. "Overcharging," and in Sections II.B.1. and II.B.2. above regarding the County of San Bernardino and the 1st and

2nd District Courts of Appeal, Iron Mountain has engaged in a corporate pattern and practice of overcharging its customers by various methods. Iron Mountain also followed a corporate pattern and practice of not correcting known errors, unless such errors were in Iron Mountain's favor. Accordingly, known overcharges were not refunded to customers.

208.  Relator is informed and believes that Iron Mountain knowingly overcharged additional state and local entities within the State of California using methods including but not limited to those detailed above, including the following public entities within the State of California known to have contracts with Iron Mountain during the time period relevant to the complaint:  a) all Iron Mountain CMAS customers (including but not limited to the California Department of Conservation, the California Fair Political Practices Committee, the California Department of Insurance, the California Department of Justice, the California Resources Agency (CALFED Bay-Delta)); b) all customers whose contracts with Iron Mountain included a best price, low price guarantee, most favorable pricing, or similar clause, or whose contracts negotiation or pricing were based in any way on CMAS or GSA pricing, including but not limited to the City of Los Angeles and the County of Santa Clara; and c) all customers to whom Iron Mountain submitted claims including known overcharges and/or failed to refund known overcharges, including the California 1st District Court of Appeal (San Francisco), the California 2nd District Court of Appeal (Los Angeles), and the County of San Bernardino, and, upon information and belief based upon Iron Mountain's corporate pattern and practice of overcharging as described herein, including all California state and local entities that purchased services from Iron Mountain during the period 2001 to the present,  including but not limited to all California customers listed above plus the California 3d District Court of Appeal, County of Los Angeles, County of San Diego, County of Orange, the Superior Court of California for the County of Butte,  the Superior Court of California for the County

of Sierra, the Superior Court of California for the County of Ventura,  the City of Concord, the City of Thousand Oaks, Metropolitan Water District of Southern California (Los Angeles), Metropolitan Transit Authority (Los Angeles), and the California Technology Agency (a.k.a. Department of Technical Services or Teale Data Center).

209.   Each claim which included overcharges as described above or as to which Iron Mountain knew of overcharges but failed to return them was a false claim and/or reverse false claim.

210.   Each Iron Mountain state and local California customer was damaged to the extent it paid the amounts falsely charged by Iron Mountain in excess of amounts actually due under each customer's contract.

211.   The time period during which false claims occurred extends from 2001 through the date of the complaint and is ongoing.

## COUNT ONE

## False Claims Act, 31 U.S.C. § 3729(a)(1) (pre FERA amendment)

212.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

213.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

214.   By virtue of the acts described above, defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment to the United States government.

215.   The false claims were material to the United States' payment decision and caused the United States to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the claims not been false.

216.   By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO

**False Claims Act, 31 U.S.C. § 3729(a)(2) (pre FERA amendment)**

217.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

218.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

219.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to get government payment for false or fraudulent claims.

220.   The false records or statements were material to the United States' payment decision and caused the United States to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the records or statements not been false.

221.   By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE

**False Claims Act, 31 U.S.C. § 3729(a)(7) (pre FERA amendment)**

222.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

223.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

224.   By engaging in the acts described above, defendants avoided or reduced obligations owed to the United States Government.

225.   By reason of defendants' conduct, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FOUR

### False Claims Act, as amended by FERA, 31 U.S.C. § 3729(a)(1)(A)

226.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

227.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

228.   By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

229.   The false claims were material to the United States' payment decision and caused the United States to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the claims not been false.

230.   By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FIVE

### False Claims Act, as amended by FERA, 31 U.S.C. § 3729(a)(1)(B)

231.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

232.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

233.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

234.   The false records or statements were material to the United States' payment decision and caused the United States to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the records or statements not been false.

235.   By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SIX

### False Claims Act, as amended by FERA, 31 U.S.C. § 3729(a)(1)(G)

236.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

237.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

238.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

239.   By reason of these actions, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SEVEN

### California False Claims Act, Cal. Gov't Code § 12651(a)(1)

240.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

241.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.*, as amended.

242.   By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims to an officer or employee of the State of California, the City of Los Angeles, and other state and local entities for payment or approval.

243.   The false claims were material to the State of California's, the City of Los Angeles' and other state and local entities' payment decisions and caused the State of California and the City of Los Angeles and other state and local entities to

pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the claims not been false.

244.   By reason of these payments, the State of California, the City of Los Angeles, and other state and local entities have been damaged, and continue to be damaged, in substantial amount.

## COUNT EIGHT

### California False Claims Act, Cal. Gov't Code § 12651(a)(2)

245.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

246.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.*, as amended.

247.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used material false records or statements to get a false claim paid or approved by the State of California, the City of Los Angeles, and other state and local entities.

248.   The false records or statements were material to the State of California's, the City of Los Angeles' and other state and local entities' payment decisions and caused the State of California and the City of Los Angeles and other state and local entities to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the records or statements not been false.

249.   By reason of these payments, the State of California, the City of Los Angeles, and other state and local entities have been damaged, and continue to be damaged, in substantial amount.

## COUNT NINE

### California False Claims Act, Cal. Gov't Code § 12651(a)(7)

250.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

251.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.*, as amended.

252.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used material false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of California, the City of Los Angeles, and other state and local entities.

253.   The false records or statements were material to the State of California's, the City of Los Angeles' and other state and local entities' payment decisions and caused the State of California and the City of Los Angeles and other state and local entities to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the records or statements not been false.

254.   By reason of defendants' conduct, the State of California, the City of Los Angeles and other state and local entities have been damaged, and continue to be damaged, in substantial amount.

## COUNT TEN

### California False Claims Act, Cal. Gov't Code § 12651(a)(8)

255.   Relators reallege and incorporate paragraphs 1 to 211 above as if fully set forth herein.

256.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.,* as amended.

257.   By virtue of the acts described above, defendants were beneficiaries of inadvertent submissions of false claims to the State of California, the City of Los Angeles, and other state and local entities, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California, the City of Los Angeles or other state and local entities within a reasonable time after discovery of the false claims.

258.   The false claims were material to the State of California's, the City of Los Angeles' and other state and local entities' payment decisions and caused the State of California and the City of Los Angeles and other state and local entities to pay claims which would not have been paid, and to pay defendants amounts in excess of what would have been paid, had the claims not been false.

259.   By reason of defendants' conduct, the State of California has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, Relators, on behalf of themselves, the United States, the State of California and other California state and local entities, pray for judgment in plaintiffs' favor and against defendants, as follows:

a.   Ordering defendants to pay an amount equal to three times the amount of damages the United States, the State of California and other California state and local entities have sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each action in violation of 31 U.S.C. § 3729, and a civil penalty of up to $10,000 for each action in violation of Cal. Gov't Code § 12651, and the costs and expenses of this action, with interest, including the costs and expenses to the United States, the State of California and other California state and local entities;

b.   Awarding Relators the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g);

c.   Awarding Relators all fees, costs, and expenses incurred in initiating and sustaining this action, including reasonable attorneys' fees;

d.   Awarding Relators pre-judgment interest; and

1        e.    Granting Relators, the United States, the State of California and other

2    California state and local entities all other such relief as the Court deems just and

3    proper.

4

5    Dated: May 21, 2013            Respectfully submitted,

6                                            LAW OFFICES OF PAUL D. SCOTT, P.C.

7                                            Paul D. Scott, Esq.

8                                            Lani Anne Remick, Esq.

9

10                                           By:_____

11                                                 Paul D. Scott, Esq.

12                                           Attorneys for *Qui Tam* Plaintiffs

13                                           Brent Stanley and Patrick McKillop

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand trial by jury.

Dated: May 21, 2013

Respectfully submitted,

LAW OFFICES OF PAUL D. SCOTT, P.C.
Paul D. Scott, Esq.
Lani Anne Remick, Esq.

By: _____
      Paul D. Scott, Esq.

Attorneys for *Qui Tam* Plaintiffs
Brent Stanley and Patrick McKillop

74

## PROOF OF SERVICE BY FIRST-CLASS MAIL

I, the undersigned, declare:

I am over the age of 18 and not a party to this cause.  I am employed in the City and County of San Francisco; my business address is Pier 9, Suite 100, The Embarcadero, San Francisco, California 94111.

I hereby certify that the foregoing **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS** was served by first class mail on the date set forth below on the following:

Catherine J. Swann, Esq.
U.S. Attorney's Office
Robert T. Matsui United States Courthouse
501 I Street, Suite 10-100
Sacramento, CA 95814

Rachel Coles
Deputy Attorney General
California Department of Justice
1300 I Street
Sacramento, CA 95814

I declare under penalty of perjury of the laws of the United States and the State of California that the foregoing is true and correct.  Executed on May 2 1 , 2013 at San Francisco, California.

TYLER J. KASSNER